817 F.Supp.2d 346 (2011)
In re J. Ezra MERKIN and BDO Seidman Securities Litigation.
Croscill Inc., et al., Plaintiffs,
v.
Gabriel Capital, L.P., et al., Defendants,
Morris Fuchs Holdings, LLC, Plaintiff,
v.
Gabriel Capital, L.P., et al., Defendants.
Nos. 08 Civ. 10922(DAB), 09 Civ. 6031(DAB), 09 Civ. 6483(DAB).
United States District Court, S.D. New York.
September 23, 2011.
*348 Arthur N. Abbey, Nancy Kaboolian, Richard Barry Margolies, Stephen Thran Rodd, Karin Elizabeth Fisch, Abbey Spanier Rodd Abrams & Paradis, LLP, Gregory Mark Nespole, Malcolm Todd Brown, Demet Basar, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Plaintiffs,
Andrew J. Levander, Gary John Mennitt, Neil A. Steiner, Gary John Mennitt, Dechert, LLP, Ira George Greenberg, Robert Novack, Charles W. Stotter, Florence Amanda Crisp, Edwards Wildman Palmer LLP, Karen Yasmine Bitar, Adam David Cole, Greenberg Traurig, LLP, New York, NY, M. Katherine Stroker, M. Katherine Stroker, Dechert LLP, Philadelphia, PA, Peter A. Wald, Latham & Watkins, L.L.P., San Francisco, CA, for Defendants.

MEMORANDUM AND ORDER
DEBORAH A. BATTS, District Judge.
This action arises from the well-known fraud perpetrated by Bernard L. Madoff ("Madoff") through his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS"). Plaintiffs New York Law School ("NYLS"), Scott Berrie ("Berrie"), Jacob E. Finkelstein CGM IRA Rollover Custodian ("Finkelstein"), and Nephrology *349 Associates PC Pension Plan ("Nephrology") (collectively, "NYLS Plaintiffs"), as well as Croscill, Inc., Florence Kahn Weinberg Intervivos Trust, Douglas J. Kahn 2008 Family Trust, and David Kahn 2008 Family Trust (collectively, "Croscill Plaintiffs"), and Morris Fuchs Holdings, LLC ("Fuchs Plaintiff) (the NYLS, Croscill and Fuchs Plaintiffs, collectively, "Plaintiffs")[1], bring this action on behalf of investors in three hedge funds: Ascot Partners, L.P. (the "Ascot Fund"), Gabriel Partners, L.P. (the "Gabriel Fund"), and Ariel Fund, Ltd. (the "Ariel Fund") (collectively, "the Funds").
Defendant J. Ezra Merkin ("Merkin") was the general partner of the Ascot Fund and the Gabriel Fund. Merkin was also the sole shareholder and director of Defendant Gabriel . Capital Corporation ("GCC"), which in turn was the investment advisor to the Ariel Fund. Defendant BDO USA, LLP, f/k/a BDO Seidman, LLP ("BDO USA") served as the auditor of the Ascot Fund and the Gabriel Fund, while Defendants BDO Cayman Islands, formerly trading as BDO Tortuga ("BDO Cayman"), and BDO Limited, formerly trading as BDO Binder ("BDO Limited")[2], served as the auditors for the Ariel Fund. The Funds invested heavily with BMIS, The reported value of the Funds' assetsand thus the value of Plaintiffs' investments in the Fundsdropped significantly in 2008 when Madoff s massive Ponzi scheme was discovered.
In their Third Consolidated Amended Class Action Complaint[3] ("TAC"), Plaintiffs allege that Defendants Merkin and GCC failed to disclose the Funds' investments with Madoff, or that they should have performed better due diligence in connection with such investments. Plaintiffs assert seven claims against Defendants Merkin and GCC, for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as common law claims for breach of fiduciary duty, gross negligence, unjust enrichment, fraud, and negligent misrepresentation. The Croscill and Fuchs Complaints also assert claims for fraudulent concealment and breach of contract.
Plaintiffs allege that Defendants BDO USA, BDO Cayman, and BDO Limited (the "Auditor Defendants") failed to perform their work in a manner consistent with "Generally Acceptable Auditing Standards" ("GAAS") and "Generally Accepted Accounting Principles" ("GAAP"), and that these Auditor Defendants should have conducted further work to ferret out Madoff s fraud. Plaintiffs assert six claims against the Auditor Defendants for violations of section 10(b) of the Exchange Act, as well as common law claims for breach of fiduciary duty, aiding and abetting breach of *350 fiduciary duty, unjust enrichment, common law fraud, and negligent misrepresentation.
Defendants Merkin and GCC now move to dismiss Plaintiffs' TAG, as well as the separate Complaints of Croscill and Fuchs, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). Defendant BDO USA moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Finally, Defendants BDO Cayman and BDO Limited move to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(2) and 12(b)(6).[4]
For the reasons below, Defendants' Motions to Dismiss are GRANTED and the Complaints are DISMISSED.[5]

I. BACKGROUND
The following facts, drawn from the TAG, are assumed to be true for purposes of the Motions to Dismiss.[6]

A. The Funds
The Ascot Fund is a Delaware limited partnership. (TAC ¶ 32.) Investors in the Ascot Fund are limited partners of Ascot Partnership. (TAC ¶ 50.) Substantially all of the assets of Ascot Fund were invested in Madoff. (TAC ¶ 49.) Lead Plaintiff NYLS invested $3 million by purchasing a limited partnership interest in the Ascot Fund in 2006 and it continues to own that investment, which is now virtually worthless. (TAC ¶ 20.)
The Gabriel Fund is also a Delaware limited partnership. (TAC ¶ 33.) Investors in the Gabriel Fund are limited partners of the Gabriel Partnership. (TAC ¶ 79.) Lead Plaintiff Berrie invested $500,000.00 by purchasing a limited partnership interest in the Gabriel Fund and continues to hold that investment. (TAC ¶ 21.) The Croscill Plaintiffs investment in the Gabriel Fund was once over $4 million. (Croscill Compl. ¶ 15.) Plaintiff Fuchs invested $10,135 million in Gabriel in January 2006. (Fuchs Compl. ¶ 15.) Plaintiffs allege that the Gabriel Fund has lost approximately 30% of its value as a result of the wrongful conduct of Defendants. (Croscill Compl. ¶ 15; Fuchs Compl. ¶ 23.)
The Ariel Fund is an off-shore hedge fund that is a Cayman Islands corporation. (TAC ¶ 34.) Ariel was formed to undertake business as a corporate open-ended investment fund and is considered to be the "offshore twin" of Gabriel, i.e., investments in Ariel were made to track, or be in lockstep with, those of Gabriel. (TAC ¶¶ 34, 78.) Shareholders in the Ariel Fund must be non-U.S. persons or U.S. persons subject to ERISA, or otherwise exempt from paying Federal Income Tax. (TAC ¶ 34.) Investors in the Ariel Fund are *351 purchasers of redeemable participating preference shares. (TAG ¶ 82.) Co-Lead Plaintiff Finkelstein, a U.S. resident, invested $500,000 in the Ariel Fund, and Plaintiff Nephrology, a U.S. resident, invested over $1 million in the Ariel Fund by purchasing redeemable participating preference shares. (TAG ¶¶ 22-23.)

B. Defendants Merkin and GCC
Defendant Merkin is the founder, General Partner and Manager of both the Ascot Fund and the Gabriel Fund. (TAG ¶ 24.) Defendant GCC is a Delaware corporation which, along with Defendant Merkin, is headquartered in New York City. (TAG ¶¶ 24-25.) Defendant Merkin is the sole shareholder and sole director of GCC, which is the investment advisor to the Ariel Fund. (TAG ¶ 24.)

C. The Madoff Fraud
The basic facts surrounding Madoff's Ponzi scheme are by now well-known. In 1959, Madoff founded BMIS, a securities broker-dealer firm. At some point, Madoff and BMIS began to represent that they used a "split-strike conversion" strategy to manage assets for its investors. BMIS provided its investors with periodic statements that showed purported trades, and resulting profits, on customer accounts. However, those trades and resulting profits were fictitious. In classic Ponzi scheme fashion, when profits needed to be paid to individual investors who made a withdrawal from their account, the profits actually came from additional investments made by other investors, such as feeder funds.
In the late 1980's, Defendant Merkin began running his own investment funds. (TAG ¶ 47.) Sometime in the early 1990's, Merkin met Madoff and they started doing business together. (TAG ¶ 48.) Sometime thereafter, Defendant Merkin started raising large sums of money from investors, including Lead Plaintiffs and other investors, and investing some of these funds in Madoff and BMIS. (TAG ¶ 48.)
On December 10, 2008, Madoff admitted running the largest Ponzi scheme in history. (TAC ¶ 37.) On December 11, 2008, Madoff and BMIS were criminally charged for their fraud. (TAC ¶¶ 38-39.) On June 29, 2009, after pleading guilty, Madoff was sentenced to 150 years in prison. (TAG ¶ 44.) At the time that the Madoff fraud v/as revealed, Defendants Merkin and GCC had entrusted to Madoff virtually all of the investment capital of the Ascot Fund, and at least 25% of the investment capital of the Gabriel Fund and the Ariel Fund. (TAC ¶ 38.)

D. Alleged Intentional or Reckless Misrepresentations by Defendants Merkin and GCC
The TAG alleges that Defendants Merkin and GCC, as managers of the Funds, made various misrepresentations. (See generally TAC ¶¶ 55, 70-77, 88-90, 96-100, 110.) Summarized, these misrepresentations included: how the funds were to be managed; where and how investments would be made; and what Defendant Merkin's role was to be in management of the Funds. (TAC ¶¶ 44-77, 84-95, 110-20.) Plaintiffs allege that these misrepresentations occurred through the dissemination of prospectuses and offering memoranda, as well as part of quarterly reports, presentations and individual statements made by Defendant Merkin to investors.
Defendant Merkin offered participation in the Ascot Fund to qualified investors through a series of confidential offering memoranda issued in 1992, 1996, 2002, and 2006. (TAC ¶ 53.) Similarly, Defendant Merkin offered participation in the Gabriel Fund and Ariel Fund to qualified investors through prospectuses and confidential offering memoranda. (TAC ¶ 88.)
*352 Plaintiffs allege these offering memoranda and prospectuses were filled with misrepresentations by Merkin and GCC, For instance, the TAC alleges that certain offering memoranda "falsely stated that Merkin was involved in the Fund's management on a day-to-day and transaction-by-transaction basis" and that Merkin would provide "active management" of the Funds. (TAG ¶¶ 55-60, 90-91, 96-102.) Plaintiffs allege that the documents provided a specific investment strategy that was a total sham as 100% of the Ascot Fund, and approximately 25% of each of the Ariel Fund and the Gabriel Fund, were invested in Madoff. (TAG ¶¶ 61-63, 92, 103.) Plaintiffs also allege that Defendants Merkin and GCC invested more in a single investment (Madoff) than was permitted in the prospectuses and offering memoranda, (TAC ¶¶ 69, 93, 106), and no reasonable care was used in selecting Madoff as an independent money manager. (TAC ¶¶ 67, 95, 98.)
Plaintiffs allege that Defendant Merkin and Defendant GCC also made false and misleading statements in the form of quarterly reports, presentations, and periodic statements made by Defendant Merkin. For instance, Plaintiffs allege that Defendant Merkin and GCC touted that it used "actively managed strategies," when the real strategy was to do little more than entrust Madoff. (TAC ¶ 72.) Plaintiffs also allege that Defendant Merkin outright lied to investors, including Defendant Merkin's statement to certain Ascot Fund investors that Madoff has little involvement in investing on behalf of the Ascot Fund. (TAC ¶¶ 74-76.)

E. Allegations Against the Auditor Defendants
Defendant BDO USA served as auditor of the Ascot Fund and Gabriel Fund. (TAC ¶ 26.) Defendants BDO Limited and BDO Cayman served, successively, as the independent auditor for the Ariel Fund. (TAC ¶¶ 27-28).
Plaintiffs allege that the Auditor Defendants failed to perform their work as auditors in a manner consistent with GAAS, and for the U.S.-based funds (Ascot Fund and Gabriel Fund), GAAP. (TAC ¶ 193.) The alleged GAAS and GAAP violations included that the Auditor Defendants' failed to read relevant prospectuses and offering memoranda and that the Auditor Defendants should have discovered various "red flags" of Madoffs fraud. Plaintiffs allege these red flags included: Madoff was the sole manager of the Ascot Fund and managed 25% of the Ariel Fund and Gabriel Fund; Defendant Merkin was not actively managing the day-to-day activities of the Funds; a lack of internal controls; and various additional indicators of Madoffs fraud. (TAC ¶¶ 196-200, 202-03.)
Defendants BDO Cayman and BDO Limited were the independent auditors for the Ariel Fund, and were identified as such in the Ariel Fund prospectuses, offering memoranda, audit reports and financial statements that were distributed to existing and potential Ariel Fund investors. (TAC ¶¶ 26-28, 30, 178-79.) Defendants BDO Cayman and BDO Limited issued clean audit reports on the Ariel Funds' annual financial statements, which they knew would be provided to, and relied upon by, existing and potential Ariel Fund investors, including those residing in the United States. (TAG ¶¶ 26-28, 30, 179, 183-85, 245, 254, 279, 284.) Defendant BDO Cayman provided the audited Financials to Defendant BDO USA, which it knew printed and delivered the audited financial statements to New York. (See Declaration of Glen Trenouth ("Trenouth Decl.") ¶ 5.)
BDO Cayman is organized under the laws of the Cayman Islands, (TAC ¶ 28), and is not registered to do business in the *353 United States. (Trenouth Decl. ¶¶ 2-3.) BDO Cayman has all of its property in the Cayman Islands, and all of its personnel live and work in either the Cayman Islands or the British Virgin Islands ("BVI").
BDO Limited is organized under the laws of the British Virgin Islands, (TAC ¶ 27), and is not registered to do business in the United States. (Decl. of Andrew Bickerton ¶¶ 2-3.) It has offices only in the BVI, all of its personnel live and work only in the BVI, and all of its property is located in the BVI. (Id.) BDO Limited has no property in the United States. (Id.)

II. DISCUSSION

A. Legal Standard
For a complaint to survive a motion brought pursuant to Rule 12(b)(6), the plaintiff must have pleaded "enough facts to state a claim to relief that is plausible on its face." Bell All. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility," the Supreme Court has explained,
when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a `probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are `merely consistent with' a defendant's liability, it `stops short of the line between possibility and plausibility of entitlement to relief.'
Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Twombly, 550 U.S. at 556-57, 127 S.Ct. 1955). "[A] plaintiffs obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks omitted). "In keeping with these principles," the Supreme Court has stated,
a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.
Iqbal, 129 S.Ct. at 1950.
In considering a Motion under Rule 12(b)(6), the Court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir.2004). However, this principle is "inapplicable to legal conclusions," Iqbal, 129 S.Ct. at 1949, which, like the complaint's "labels and conclusions," Twombly, 550 U.S. at 555, 127 S.Ct. 1955, are disregarded. Nor should a court "accept [as] true a legal conclusion couched as a factual allegation." Id. at 555, 127 S.Ct. 1955.
In ruling on a 12(b)(6) motion, a court may consider the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." Zdenek Marek v. Old Navy (Apparel) Inc., 348 F.Supp.2d 275, 279 (S.D.N.Y.2004) (citing Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (internal quotations omitted)). However, *354 though such evidence may be considered when attached to or incorporated into the Complaint, the Court's function is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Id. (citing Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985)).
Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss. First, allegations of fraud must satisfy Rule 9(b), which requires that the plaintiff "state with particularity the circumstances constituting fraud." Fed. R.Civ.P. 9(b). The TAG must therefore "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.2007).
Second, the TAG must provide "particular allegations giving rise to a strong inference of scienter""that the defendant acted with the required state of mind." ECA & Local 13U IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir.2009) (internal quotation marks omitted). In order to satisfy the pleading requirements of § 10(b) and Rule 10b-5 with respect to scienter, the plaintiff may "alleg[e] facts; (1) showing that the defendants had both motive and opportunity to commit the fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99. The court must take into account plausible opposing inferences when determining whether pleaded facts give rise to a strong inference of scienter, and the inference of scienter must be at least as compelling as any opposing inference that could be drawn from the alleged facts in order to satisfy the standard. Tellabs, Inc. v. Makor Issues & Rights, Ltd, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

B. Claims under Section 10(b) and Rule 10b-5[7]
Defendants move to dismiss the claims asserted against them pursuant to § 10(b) of the Exchange Act and Rule 10b-5. Section 10(b) of the 1934 Act provides that no person or entity may, in connection with the purchase or sale of a security, "use or employ ... any manipulative or deceptive device or contrivance" in contravention of an SEC rule. 15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or ... omit ... a material fact necessary in order to make the statements made ... not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.
In order to succeed on a claim under Rule 10b-5, Plaintiffs must "establish that `the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs reliance on the defendant's action caused injury to the plaintiff.'" Lawrence v. Cohn, 325 F.3d 141, 147 (2d Cir.2003) (quoting Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir.2000)). In order for the misstatement to be material, "`there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as *355 having significantly altered the "total mix" of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

1. Section 10(b) Claims against Defendants Merkin and GCC

a. Material Misrepresentation or Omission
Plaintiffs' § 10(b) claims against Defendants Merkin and GCC fail because the TAC does not adequately allege a material misstatement or omission. Plaintiffs argue that Defendants made a number of misrepresentations, including; (1) Defendant Merkin was more involved in the Funds that he actually was; (2) the Funds' strategies were different than what was reported to the investors; and (3) those that monitored the Funds should have discovered Madoff s fraud.
In support of the arguments that Defendant Merkin misrepresented his involvement in the Funds, Plaintiffs point to various statements in offering memoranda and prospectuses, including the statements: "all decisions with respect to the management of the capital of the [Ascot] Partnership [were] made exclusively by J. Ezra Merkin" and "the [Ascot] Partnership's success depends to a great degree on the skill and experience of Mr. Merkin," (TAG ¶ 56); Merkin was required to devote "substantially his entire time and effort during normal business hours to his money management activities, including (but not limited to) the affairs of the [Ascot] partnership," (TAG ¶ 57); Merkin was to spend "substantially his entire time and effort during normal business hours to the management of the [Gabriel] Partnership," (TAC ¶ 57); "[t]he Investment Advisor will retain overall investment responsibility for the portfolio of the [Ariel] Fund," (TAC ¶ 101); and a provision that the Funds would need to be terminated upon Merkin's death or incapacity. (TAC ¶¶ 60, 91, 97).
However, the language that Plaintiffs cite in offering memoranda and prospectuses must be read in the context of each entire document. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 365-66 (2d Cir.2010) ("[w]hen analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety ... [t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of `defendants' representations, taken together and in context.'"); see also Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir.1996) ("prospectuses must be read `as a whole.'"). Plaintiffs cannot be permitted to "cherry pick" language from the offering memoranda, and then ignore explicit cautionary language, which warned Plaintiffs that third-party managers would have custody over the Funds' assets and that this custody carried a risk of loss.
For instance, the Ascot Fund offering memorandum ("OM") expressly advises that "the success of the Partnership may also be dependent upon other money managers or investment advisors to Other Investment Entities" and that "the actions or inactions on the part of other money managers... may affect the profitability of the Partnership." (Ascot OM at 17; see also Gabriel OM at 28; Ariel OM at 40-41.) Each Fund offering memoranda also warned that Defendant Merkin could delegate investment discretion to third-party managers without notice to, or the consent of, any investor in the Funds, and that when he delegated such authority he did not have responsibility for the "investment decisions of any independent money managers." (Ascot OM at 2; Gabriel OM at 2; Ariel OM at 2.) Reading Plaintiffs' language *356 regarding Defendant Merkin's obligations to the Funds in conjunction with this cautionary language, it is clear there was no actual misrepresentation by Defendants as to Defendant Merkin's commitment to the Funds.
Plaintiffs' allegations that Defendants Merkin and GCC misrepresented the Funds' investment strategies are also unavailing. Plaintiffs allege Defendants Merkin and GCC "handed-over" all of the Ascot Funds' assets, and 25% of the Gabriel and Ariel Funds' assets, in "direct contravention of the Funds' stated strategies." (PI. Merkin & GCC Opp. Br. at 18-19.) Plaintiffs' characterize Defendant Merkin's portrayal of the Funds' investment strategies as "complete falsehood[s]" given Madoffs true involvement. Id. at 20. Plaintiffs argue that even though the Funds' strategy may have aligned with the strategy Madoff purported to be employing, (e.g., Ascot OM at 12), Defendants Merkin and GCC were really only making one investment: Madoff.
Plaintiffs' arguments, however, are without merit. The use of Madoff as a third-party manager here was made with the understanding that Madoff would, in turn, make investments that would comport with the Funds' strategies. While in hindsight the use of Madoff proved to be detrimental, the use of a third-party manager to execute a fund's overall investment strategy does not, without more, give rise to a claim under § 10(b). See generally In re Beacon Assocs. Litig., 745 F.Supp.2d 386 (S.D.N.Y.2010), In re Tremont Sec. Law, State Law and Ins. Litig., 703 F.Supp.2d 362 (S.D.N.Y.2010), S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98 (2d Cir.2009).
Finally, Plaintiffs' allegations that Defendant Merkin and GCC improperly delegated investment authority to Madoff and did not conduct proper due diligence is also without merit. First, the Second Circuit has made clear that the alleged failure to conduct due diligence generally does not give rise to a securities fraud claim. See S. Cherry, 573 F.3d at 112-13; In re Beacon, 745 F.Supp.2d at 411 ("[W]hen a business promises to conduct due diligence, but is incompetent or mismanaged and fails to uphold its promise, an aggrieved investor's remedy lies in a breach of contract action rather than a federal securities fraud action.") (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993)).
Second, it is now well-established that Madoff cleverly leveraged his considerable reputation in order to perpetrate his massive fraud, for many years, without detection by some of the most sophisticated entities in the financial world: the SEC, Wall Street banks, and the like. The list of victims that failed to detect Madoff s fraud is lengthy. In line with what other courts have done, this Court will not recognize a § 10(b) claim against those who did business with Madoff, simply by imputing the suspicions of a few (albeit, wise) people who suspected Madoff s fraud before it was ever discovered.

b. Scienter
In addition to a failure to plead adequately a material misstatement or omission, Plaintiffs' § 10(b) claims also fail because Plaintiffs fail to allege scienter. To satisfy the pleading requirements of § 10(b) and Rule 10b-5 with respect to scienter, Plaintiffs must "alleg[e] facts; (1) showing that the defendants had both motive and opportunity to commit the fraud; or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, 493 F.3d at 99.
Plaintiffs' arguments on scienter are two-fold: (1) Defendants actually knew that their public statements regarding management, investment strategies, and due diligence were false, or, at the very *357 least (2) Defendants should have known that their public statements were false because of glaring red flags and obvious signs of fraud.[8](See generally Pl.s' Br., citing TAC ¶¶ 125-26, 133-42.) Among these red flags, Plaintiffs allege that Defendant Merkin admitted in sworn testimony "that he was aware of a number of people who were suspicious of the returns Madoff claimed to achieve." (TAG ¶ 126.) Plaintiffs also allege Merkin received, and kept, a copy of the May 2001 Barron's and MAR/Hedge articles discussing the belief of many hedge fund professionals and market strategists that Madoff could not possibly achieve the returns he reported under his investment strategies. (TAC ¶ 131-32.)
This Court is guided by the Second Circuit's decision in South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98 (2d Cir.2009), which held that an investment advisor who recommends investments in a fund that turns out to be a Ponzi scheme will not ordinarily be held liable for securities fraud unless the investor alleges particular facts giving rise to a strong inference that the advisor either had fraudulent intent, or acted with "conscious recklessness" as to truth or falsity of the advisor's statements to the investor. As Judge Sand found in In re Beacon, while applying South Cherry, allegations of Madoffrelated red flags do not adequately plead scienter. See In re Beacon, 745 F.Supp.2d at 414 (applying South Cherry and holding that allegations that managers of funds that invested with Madoff failed to heed red flags did not support a finding or scienter).[9]

2. Section 10(b) Claims Against the Auditor Defendants [10]
Plaintiffs allege that the Auditor Defendants failed to perform their work as auditors in a manner consistent with GAAS *358 and/or GAAP. (TAG ¶ 193.) These failures included a failure to read relevant prospectuses and offering memoranda. (TAG ¶ 196.) Plaintiffs also allege that the Auditor Defendants should have discovered various "red flags," including that Madoff was the sole manager of Ascot and managed 25% of Ariel and Gabriel; Defendant Merkin was not actively managing the day-to-day activities of the Funds; there was a lack of internal controls at the Funds; and there were obvious indications of Madoff s fraud. (TAG Ml 196-200.)
These federal securities claims against the Auditor Defendants, however, are insufficient, as Plaintiffs fail to plead the scienter necessary to establish a claim under the Exchange Act. Plaintiffs' allegations of "red flags" are nothing more than an effort to recast negligence allegations as allegations of fraud, asserting that the Auditor Defendants "should have known" of Madoff s fraud. These types of allegations are insufficient to make out a 10(b) claim. See S. Cherry, 573 F.3d at 112. Simply put, the Auditor Defendants' failure to identify Madoffs fraud does not constitute reckless conduct sufficient to impose Section 10(b) liability. Novak v. Kasaks, 216 F.3d 300, 305 (2d Cir.2000) (citing Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120 (2d Cir.1982)). In addition, allegations of GAAP or GAAS violations, standing alone, are insufficient to state a claim for relief against an accountant under the federal securities laws. S. Cherry St., LLC v. Hennessee Grp. LLC, 534 F.Supp.2d 405, 416 (S.D.N.Y.2007); Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir.1999).
Plaintiffs attempt to buttress their federal securities claim by alleging that Defendant Merkin received "express warnings" about Madoff and then he discussed these express warnings with the Auditor Defendants. See Nespole letter, dated July 15, 2011. However, the TAG makes no such allegation. Instead, all it alleges is that Defendant Merkin once testified that "[t]here were over time persons who expressed skepticism about one or another aspect of the Madoff strategy or the Madoff return," (TAC ¶ 126), that Merkin spoke to a BDO partner about the Madoff strategy, and that there "were persons at BDO Seidman who were familiar with our strategy, familiar with the returns, [and] familiar with their risks ...." These allegations are a far cry from an "express warning." Also, the fact that Merkin spoke to individuals at the Auditor Defendants about Madoff is not a proper allegation that this "alleged skepticism" was ever even disseminated to the Auditor Defendants. Again, there is simply no basis for imputing scienter just because a nonparty had a hunch or a gut feeling about Madoff, especially when juxtaposed against his considerable reputation and success within the investment community.[11]
*359 Here, there is no competent allegation of actual or reckless fraudulent intent on the part of the Auditor Defendants. Accordingly, no federal securities claim can be sustained against them.[12]

C. SLUSA Preemption
The Securities Litigation Uniform Standards Act of 1998, Pub.L. No. 105-353, 112 Stat. 3227 ("SLUSA") explicitly provides for the preemption by federal law of certain categories of securities actions brought under state law. H-Quotient, Inc. v. Knight Trading Grp., No. 03 Civ. 5889(DAB), 2007 WL 2729010, at *3 (S.D.N.Y. Sep. 13, 2007). Defendants argue, inter alia, that all of Plaintiffs' state law causes of action are barred by SLUSA.
SLUSA mandates dismissal when: (1) a suit is a covered class action; (2) brought under state or local law; (3) concerning a covered security; (4) the defendant is alleged to have misrepresented or omitted a material fact or employed a manipulative device or contrivance; and (5) it is "in connection with the purchase or sale" of that security. 15 U.S.C. §§ 77p(b), 78bb(f)(1); Barron v. Igolnikov, No. 09 Civ. 4471(TPG), 2010 WL 882890, at *3-5 (S.D.N.Y. Mar. 10, 2010) (citations omitted).
To trigger SLUSA, a complaint must allege either "(1) an explicit claim of fraud or misrepresentation (e.g., common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that sound in fraud." Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc., 341 F.Supp.2d 258, 261 (S.D.N.Y.2004) (citation omitted). "A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." Id. at 269.
The law of the Second Circuit requires a claim-by-claim analysis as to SLUSA preemption. Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 47 (2d Cir.2005) ("Dabit I"), rev'd as to other grounds, 547 U.S. 71, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ("Dabit II"); Gray v. Seaboard Securities, 126 Fed. Appx. 14, 16 (2d Cir.2005). Because plaintiffs may seek to avoid SLUSA preemption through artful pleading, courts "must look beyond the face of the complaint to analyze the substance of the allegations made." Dabit I, 395 F.3d at 34. Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or relies on alleged misstatements or omissions. See, e.g., McCullagh v. Merrill Lynch & Co., No. 01 Civ. 7322(DAB), 2002 WL 362774 (S.D.N.Y. Mar. 6, 2002) (dismissing breach of fiduciary duty and unjust enrichment claims against securities broker which allegedly failed to provide customers with objective research and advisory services); In re WorldCom, Inc. Sec. Litig., 308 F.Supp.2d 236, 242-43 (S.D.N.Y.2004) (dismissing with prejudice state law securities fraud and negligence claims preempted by SLUSA); In re Livent, Inc. Noteholders Sec. Litig., 151 F.Supp.2d 371, 442-43 (S.D.N.Y.2001) (dismissing with prejudice state law fraud, *360 negligence, and negligent misrepresentation claims preempted by SLUSA).
First, the class action here is "covered" under SLUSA.[13] Second, the only state law claims asserted by Plaintiffs founded in fraud are: (a) all Plaintiffs' common law fraud claims; (b) all Plaintiffs' common law negligent misrepresentation claims; and (c) the Fuchs and Croscill Plaintiffs' common law fraudulent concealment claim (Count 8 in both complaints). Third, Plaintiffs allege material misrepresentations and omissions.
However, Defendants dispute the final element of the SLUSA test: whether the state law fraud claims are "in connection with a covered security." Plaintiffs argue that SLUSA does not reach their claims because they purchased shares in the Funds, rather than any covered securities within the meaning of SLUSA. Plaintiffs also argue that since Madoff s transactions were a sham, this should also prevent application of SLUSA.
Under SLUSA, a "covered security" includes any security that is listed or authorized for listing on the New York Stock Exchange or another national exchange, as well as securities issued by investment companies registered with the Securities Exchange Commission. See 15 U.S.C. § 77r(b). SLUSA's "in connection with" requirement is to be construed broadly; "it is enough that the fraud alleged `coincide' with a securities transactionwhether by the plaintiff or by someone else." Dabit II, 547 U.S. at 85-86, 126 S.Ct. 1503 (citations omitted).
The majority of district courts within the Second Circuit have found, under similar facts, that claims like the ones brought here are "in connection with covered securities." See In re J.P. Jeanneret Assoc's, Inc., 769 F.Supp.2d at 378 (state law claims against defendants associated with funds which invested with Madoff barred by SLUSA); Wolf Living Trust v. FM Multi-Strategy Inv. Fund, LP, No. 09 Civ. 1540(LBS), 2010 WL 4457322, at *3 (S.D.N.Y. Nov. 2, 2010); Newman v. Family Mgmt. Corp., 748 F.Supp.2d 299, 311-13 (S.D.N.Y.2010) (dismissing common law fraud, negligent misrepresentation, breach of fiduciary duty, gross negligence and mismanagement, unjust enrichment, malpractice and professional negligence, and aiding and abetting breach of fiduciary duty claims as barred by SLUSA); In re Beacon, 745 F.Supp.2d at 428-32 (SLUSA preempted class-action claims for fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, gross negligence, unjust enrichment, and breach of contract); Barron, 2010 WL 882890, at *3-5 (claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, and unjust enrichment barred by SLUSA); Backus v. Conn. Comm'ty Bank, N.A., No. 3:09-CV-1256 (PCD), 2009 WL 5184360 (D.Conn. Dec. 23, 2009); Levinson v. PSCC Serv., Inc., No. 3:09-CV-00269 (PCD), 2009 WL 5184363 (D.Conn. Dec. 23, 2009); but see Anwar II, 728 F.Supp.2d 372 (discussed supra).
*361 Here, Plaintiffs are alleged to have invested with the Funds. In turn, the Funds invested in Madoff, who then purported to make further securities transactions. This pass-through investment to Madoff "coincided" with a securities transaction. Id. The alleged material misrepresentations and omissions in Plaintiffs' state common law claims are in connection with the purchase and sale of a covered security. Accordingly, Plaintiffs' common law fraud, negligent misrepresentation and fraudulent concealment claims are dismissed.

D. Application of the Martin Act[14]
New York's blue sky law, commonly known as the Martin Act, provides for the Attorney General to regulate and enforce New York's securities laws. See N.Y. Gen. Bus. Law, art. 23-A, §§ 352 et seq.
The Martin Act provides:
It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to use or employ any of the following acts or practices:
(a) Any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
(b) Any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
(c) Any representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made ...
N.Y. Gen. Bus. L. § 352-c(1).
It is clearly established that there is no private right of action for claims covered by the Martin Act. Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette Inc., 919 F.Supp. 149, 153 (S.D.N.Y.1996); CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116 (1987) (promulgating rule). Any claim that is covered by the Martin Act is therefore not actionable by a private party; otherwise, the party essentially would be permitted to bring a private action under the Martin Act. Indep. Order of Foresters, 919 F.Supp. at 153; see also Pro Bono Invs., Inc. v. Gerry, No. 03 Civ. 4347(JGK), 2005 WL 2429787, at *16 (S.D.N.Y. Sep. 30, 2005) (collecting cases and concluding that "[m]ost New York courts have ... held that the [Martin] Act precludes a private right of action for common law claims the subject matter of which is covered by the Martin Act.... The federal courts have, almost without exception, adopted the same position.") (citations omitted). The Martin Act does not require the pleading or proof of scienter or intent; it preempts every claim which relies on a false statement or an unreasonable or unwarranted promise, whether made knowingly or otherwise. See N.Y. Gen. Bus. L. § 352-c(1); Barron, 2010 WL 882890, at *5.
The vast majority of courts in this district have held that the Martin Act preempts New York state law claims brought by investors seeking to recover losses related to the Madoff scandal. See Stephenson, 700 F.Supp.2d at 613-16 (dismissing breach of fiduciary duty, negligence, *362 gross negligence, and aiding and abetting breach of fiduciary duty claims as preempted); Barron, 2010 WL 882890 at *6 (dismissing claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, gross negligence, and unjust enrichment); In re Tremont, 703 F.Supp.2d at 373 (dismissing breach of fiduciary duty, negligent misrepresentation, and aiding and abetting breach of fiduciary duty claims as preempted); Meridian Horizon Fund LP v. Tremont Grp. Holdings, Inc., 747 F.Supp.2d 406, 414-15 (S.D.N.Y.2010) (dismissing common law claims for negligence as preempted); In re Beacon, 745 F.Supp.2d at 428-32 (dismissing claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, gross negligence, unjust enrichment, and breach of contract); In re J.P. Jeanneret Assoc's, Inc., 769 F.Supp.2d at 378-80 (dismissing all state law claims other than derivative claims against auditor); but see Anwar I, 728 F.Supp.2d 354 (S.D.N.Y.2010) (examining history of Martin Act preemption rule and departing from it as erroneous).
Plaintiffs argue that the line of cases establishing that the Martin Act precludes private causes of action is erroneous, drawing the Court's attention to the extensive analysis conducted by Judge Marrero in Anwar I, 728 F.Supp.2d 354 (carefully examining the Martin Act and predicting that the New York Court of Appeals would not preclude private causes of action like those asserted in the Madoff-feeder fund cases). However, the New York Court of Appeals has not examined this specific issue, and this Court remains bound to apply the result in the only Second Circuit case that has addressed this subject: Castellano v. Young & Rubicam, 257 F.3d 171, 190 (2d Cir.2001) (dismissing breach of fiduciary duty claim as preempted by Martin Act and noting that "principles of federalism and respect for state courts' interpretation of their own laws" support Martin Act preemption).[15]
Accordingly, Plaintiffs' non-fraud claims of breach of fiduciary duty, gross negligence (and mismanagement), and unjust enrichment are dismissed as preempted by the Martin Act.[16]

E. Leave to Replead
When a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). However, a court may dismiss without leave to amend when amendment would be "futile", or would not survive a motion to dismiss. Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir.2003) (internal citations omitted), rev'd on other grounds sub nom. City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005).
Here, it is not possible for Plaintiffs to cast federal securities allegations in a light that would avoid dismissal. As discussed above, the offering memoranda and prospectuses contain warnings sufficient to preclude a claim of intentional or reckless misrepresentation in those documents. No misrepresentation was made when Defendants relied on Madoff, as a third-party manager, to follow investment strategies *363 that aligned with the stated investment strategies of the Funds. In addition. Plaintiffs' allegations of red flags are unavailing given the opposing considerations of Madoff's immense reputation and deep deception. Repleading the state law fraud, fraudulent concealment, and negligent misrepresentation claims would be futile as SLUSA preemption can only be avoided by reconstituting the class to fewer than fifty, which would in itself bring this action outside this Court's jurisdiction.[17] Repleading Plaintiffs' non-fraud claims would also be futile, since all of those claims are preempted by the Martin Act, except for the breach of contract claims. Finally, the Court has declined to exercise supplemental jurisdiction over the breach of contract claims asserted by the Fuchs and Croscill Plaintiffs. Accordingly, leave to replead is denied as futile.

III. CONCLUSION
For the reasons above, Defendants' Motions to Dismiss are GRANTED. Plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 are hereby DISMISSED, WITH PREJUDICE. Plaintiffs' state law fraud, fraudulent inducement and negligent misrepresentation claims are hereby DISMISSED, WITH PREJUDICE, as they are barred by SLUSA. Plaintiffs' non-fraud state law claims are also hereby DISMISSED, WITH PREJUDICE, as they are barred by the Martin Act. The breach of contract claims asserted by the Fuchs and Croscill Plaintiffs are hereby DISMISSED, WITHOUT PREJUDICE, as the Court declines to exercise supplemental jurisdiction over these claims. The Clerk of Court is DIRECTED to CLOSE the Dockets in cases 08 Civ. 10922, 09 Civ. 6031, and 09 Civ. 6483.
SO ORDERED.
NOTES
[1] The Croscill Plaintiffs and Fuchs Plaintiff, investors in the Gabriel Fund, filed individual actions at Docket Nos. 09 Civ. 6031 (Croscill) and 09 Civ. 6483 (Fuchs). These actions have been coordinated with the consolidated class action at Docket No. 08 Civ 10922. (See Endorsed letter dated September 16, 2009 ordering coordination, 09 Civ. 6031 Dkt. # 8, 09 Civ. 6483 Dkt. # 4.)
[2] Defendants Merkin, GCC, BDO USA, BDO Cayman and BDO Limited are collectively known as "Defendants." The Funds are no longer party to this litigation. (TAC ¶¶ 32-34.) Actions against the Funds were terminated on June 18, 2010 following the filing of the Third Amended Complaint.
[3] In their Motion to Dismiss briefing, the Parties refer to Plaintiffs' TAC. Subsequent to the briefing, the Court permitted the filing of the Fourth Consolidated Amended Class Action Complaint for the limited purpose of altering the definition of the class, on the consent of Defendants. (See Docket No. 89.) As all of the parties' briefing references the TAC, for simplicity's sake, the Court will refer to the TAC as the operative pleading.
[4] All of the Motions request dismissal pursuant to Fed.R.Civ.P. 12(b)(6), and various among them also present grounds for dismissal pursuant to Rules 12(b)(1) and 12(b)(2). Because the Court dismisses the complaints in their entirety pursuant to Rule 12(b)(6), it does not reach whether dismissal is also required, in whole or in part, under the other Federal rules cited.
[5] In letters dated April 5, 2011 and September 20, 2011 Plaintiffs wrote to the Court to describe two cases on appeal and one granted leave to renew that may address the applicability of SLUSA and the Martin Act: Barron v. Igolnikov, No. 10-1387 (2d Cir.) (SLUSA); Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Management, Inc., 80 A.D.3d 293, 915 N.Y.S.2d 7 (1st Dep't 2010), leave to appeal granted, M-6308, slip op. at 1-2 (1st Dep't Feb. 17, 2011) (the Martin Act); and CRT Investments, Ltd. v. Merkin, Index No. 601052/09, slip op. (Sup.Ct. N.Y. County Sept. 14, 2011) (the Martin Act). While the Court is cognizant that guidance in this area may be forthcoming, this assumption is not assured, and the Court is not restrained from acting.
[6] Upon careful examination, the Court notes that the allegations and legal arguments of all three above-captioned actions are substantially the same. Unless otherwise noted, all references herein are to the allegations of the TAC.
[7] As described infra, the Court finds that no claim can be sustained under § 10(b), thus Plaintiffs cannot sustain any control liability claims under § 20(a) of the Exchange Act. Accordingly, Plaintiffs' § 20(a) claims are dismissed.
[8] Plaintiffs also attempt to show scienter by pleading that Defendant Merkin had both motive and opportunity to commit the fraud via Defendant Merkin's receipt of significant management fees. This alleged basis for scienter can be quickly dispatched. While Plaintiffs did plead that Defendant Merkin made annual management fees on the Funds that amounted to hundreds of millions of dollars, these management fees were between 1-1.5%, (TAC ¶¶ 162-64), and are not unreasonable. In re Beacon, 745 F.Supp.2d at 405-07 (receipt of significant annual management fees does not establish motive). In addition. Defendant Merkin's significant personal exposure to Madoff's fraud also belies any inference of intent.
[9] Plaintiffs rely extensively on Judge Marrero's decision in Anwar v. Fairfield Greenwich Ltd., 728 F.Supp.2d 372 (S.D.N.Y.2010) ("Anwar II"). In Anwar II, Judge Marrero found that alleged Madoff-related red flags were sufficient at the pleading stage to allege scienter. However, Anwar II is distinguishable on the facts as Judge Marrero was faced with principals of a fund that exchanged numerous emails noting the "the gaps in [their] knowledge" about basic information of Madoff s operation. Id. at 409. Judge Marrero found that these gaps could be small or large, and the benefit of the doubt at the motion to dismiss phase favored the plaintiffs in that case. Id. Despite Plaintiffs valiant attempts to argue otherwise, there is no similar evidence here or strong inference of scienter as was present in Anwar II, Id.
[10] Plaintiffs' claims against Defendant BDO Cayman and Defendant BDO Limited relate solely to Plaintiffs' purchases of shares of the Ariel Fund, an offshore hedge fund in the Cayman Islands. (TAG H 34). The TAG contains no allegation that Ariel Fund shares are traded on a United States domestic exchange or that Plaintiffs purchased their shares in domestic transactions. Accordingly, pursuant to Morrison v. Nat'l Australia Bank Ltd., ___ U.S. ___, 130 S.Ct. 2869, 2884, 177 L.Ed.2d 535 (2010), any Section 10(b) and Rule 10b-5 claims asserted solely on the basis of purchase of shares in the Ariel Fund must be dismissed as a matter of law on this basis. This includes all claims against Defendants BDO Cayman and Defendant BDO Limited. Defendants' argument that Morrison does not apply because certain Plaintiffs are U.S. residents is absurd on its face. See Morrison, 130 S.Ct. at 2888 (explicitly stating: "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." (emphasis added)).
[11] The Court is in receipt of Plaintiffs' letter dated April 29, 2011 requesting a pre-motion conference for leave to file an amended complaint. In the letter, Plaintiffs report that "new facts" have come to light, including that; (1) BDO USA, rather than BDO Caymen (Tortuga), audited Merkin's "offshore funds;" (2) BDO USA knew the risk that the Funds "could be involved" in a Ponzi scheme; (3) BDO USA knew of particular red flags about BMIS; and (4) BDO USA's audits were woefully deficient. After review of the letter, the Court is not swayed by Plaintiffs' attempt to infer that BDO USA audited the Ariel Fund just because BDO USA audited the U.S.-based Ascot Fund and shared such information with BDO Caymen and BDO Limited. Further, the additional proposed allegations in the letter do not address the overarching basis for the Court's dismissal of the federal securities claim against the Auditor Defendants: a lack of scienter. Accordingly, the Court denies Plaintiffs' motion for a pretrial conference.
[12] This Court is not alone in holding that, generally, federal securities claims cannot be sustained against the outside auditors of feeder funds. See, e.g., In re Tremont Sec. Law, State Law and Ins. Litig., 703 F.Supp.2d 362 (S.D.N.Y.2010), In re Beacon, 745 F.Supp.2d 386 (S.D.N.Y.2010), Stephenson v. Citco Grp. Ltd. et al, 700 F.Supp.2d 599 (S.D.N.Y.2010), Schulman v. Delaire, No. 10 Civ. 3639(HB) 2011 WL 672002 (S.D.N.Y. Feb. 22, 2011), and In re J.P. Jeanneret Assoc., Inc., 769 F.Supp.2d 340 (S.D.N.Y.2011).
[13] A covered class action is a lawsuit in which damages are sought on behalf of more than 50 prospective class members and in which common questions of law or fact predominate over questions affecting only individual members of the class. 15 U.S.C. § 78bb(f)(5)(H)(i)(I). Claims which would be barred by SLUSA if brought as covered class actions may nevertheless be brought individually or by a class of fewer than 50 individual investors. Romano v. Kazacos, 609 F.3d 512, 520 n. 2 (2d Cir.2010); Dabit II, 547 U.S. at 87, 126 S.Ct. 1503 ("The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.").
[14] The New York Attorney General has brought claims in New York State Court against Defendants Merkin and GCC, purportedly on behalf of investors in the Ascot, Ariel and Gabriel Funds. See People v. Merkin, Index No. 450879/2009 (Sup.Ct.N.Y.County).
[15] As detailed by Judge Marrero in Anwar II, there has been some recent disagreement in the application of the Martin Act. However, Martin Act preemption remains a viable defense until the New York Court of Appeals (or the Second Circuit in interpreting existing New York law) revisits this area.
[16] The Croscill Plaintiffs and the Fuchs Plaintiff have also brought breach of contract claims against Defendant Merkin in their Complaints at 09 Civ. 6031 and 09 Civ. 6483. The Court declines to exercise supplemental jurisdiction over these claims and dismisses them, without prejudice.
[17] As pled, this Court's jurisdiction is founded on the Class Action Fairness Act, which does not grant jurisdiction over actions in which "the number of members of all proposed plaintiff classes in the aggregate is less than 100." 28 U.S.C. § 1332(d)(5)(B).