11-0221-cv
Absolute Activist v. Ficeto

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2011

(Argued: November 21, 2011                    Decided: March 1, 2012)

Docket No. 11-0221-cv

————————————

ABSOLUTE ACTIVIST VALUE MASTER FUND LIMITED, ABSOLUTE EAST WEST FUND LIMITED, ABSOLUTE EAST WEST MASTER FUND LIMITED, ABSOLUTE EUROPEAN CATALYST FUND LIMITED, ABSOLUTE GERMANY FUND LIMITED, ABSOLUTE INDIA FUND LIMITED, ABSOLUTE OCTANE FUND LIMITED, ABSOLUTE OCTANE MASTER FUND LIMITED, ABSOLUTE RETURN EUROPE FUND LIMITED,

*Plaintiffs-Appellants*,

—v.—

TODD M. FICETO, Individually and as a Guardian for Natalia C. Ficeto and Hunter M. Ficeto, HUNTER WORLD MARKETS, INC., FLORIAN HOMM, COLIN HEATHERINGTON, CRAIG HEATHERINGTON, CIC GLOBAL CAPITAL LTD., SEAN EWING, ULLRICH ANGERSBACH, JOHN DOES, 1 TO 3, JANE DOES, 1 TO 3, DOE, ENTITIES 1 TO 3,

*Defendants-Appellees*.

————————————

B e f o r e :

NEWMAN, WINTER, and KATZMANN, *Circuit Judges*.

————————————

Appeal from a judgment of the United States District Court for the Southern District of

New York (Daniels, *J.*) dismissing complaint for lack of subject matter jurisdiction.  Although

we hold that it was error to dismiss the complaint for lack of subject matter jurisdiction, we agree

that the current version of the complaint fails to state claims under § 10(b) of the Securities

Exchange Act of 1934 because it does not sufficiently allege the existence of domestic securities

transactions.  We hold that to sufficiently allege the existence of a "domestic transaction in other

securities," plaintiffs must allege facts suggesting that either irrevocable liability was incurred or

title transferred within the United States.  We further hold that plaintiffs should be given leave to

amend the complaint so they can assert additional facts to suggest that irrevocable liability was

incurred or title passed in the United States and thus that the securities transactions at issue took

place in the United States.  For the reasons stated below, the judgment of the district court is

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings consistent

with this Opinion.

_____

LINDA IMES (David Spears, Christopher W. Dysard, Michelle Skinner, *on the brief*), Spears & Imes LLP, New York, N.Y., *for Plaintiffs-Appellants*.

THOMAS V. REICHERT, Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C., Los Angeles, Cal., *for Defendants-Appellees Colin Heatherington, Todd M. Ficeto, Hunter World Markets, Inc.*

ROBERT D. OWEN (Peter Ligh, *on the brief*), Sutherland Asbill & Brennan LLP, New York, N.Y., *for Defendant-Appellee Ullrich Angersbach*.

ROBERT J. ANELLO (Judith L. Mogul, Eli J. Mark, *on the brief*), Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, N.Y., *for Defendant-Appellee Sean Ewing*.

GREGORY J. WALLANCE (Angela R. Vicari, *on the brief*), Kaye Scholer LLP, New York. N.Y., *for Defendant-Appellee Craig Heatherington*.

_____

KATZMANN, *Circuit Judge*:

This case requires us to determine whether foreign funds' purchases and sales of securities issued by U.S. companies brokered through a U.S. broker-dealer constitute "domestic transactions" pursuant to *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) ("*Morrison*"), which held that § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") only applies to "transactions in securities listed on domestic exchanges[] and *domestic transactions in other securities*." *Id.* at 2884 (emphasis added).

Plaintiffs-appellants, nine Cayman Islands hedge funds (the "Funds"), appeal from a judgment of the United States District Court for the Southern District of New York (Daniels, *J.*) dismissing the complaint with prejudice. For the reasons set forth below, while we conclude that the complaint does not sufficiently allege the existence of domestic securities transactions, we conclude that the plaintiffs should be given leave to amend the complaint to assert additional facts suggesting that the transactions at issue were domestic. Specifically, we hold that to sufficiently allege the existence of a "domestic transaction in other securities," plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States. Because there has been significant ambiguity as to what constitutes a "domestic transaction in other securities," the plaintiffs should have the opportunity to assert additional facts leading to the plausible inference that either irrevocable liability was incurred or that title passed in the United States. Accordingly, we affirm the judgment of the district court in part, reverse the judgment of the district court in part, and remand the case for further proceedings consistent with this Opinion.

3

A.      The Complaint

The following facts are drawn from the allegations in the Funds' Amended Complaint filed on November 19, 2009 (the "complaint").

Plaintiffs-appellants are nine Cayman Islands hedge funds that invested in a variety of asset classes on behalf of hundreds of investors around the world, including many investors in the United States. Each of the Funds engaged Absolute Capital Management Holdings Limited ("ACM") from at least the middle of 2004 to act as its investment manager. ACM typically charged each Fund a monthly management fee of 2% per annum based on the particular Fund's net asset value ("NAV") and a monthly performance fee of 20% of the increase in value of the Fund's NAV.

At all relevant times, defendant Florian Homm was the Chief Investment Officer of ACM, and defendants Sean Ewing and Ullrich Angersbach were the Chairman/Chief Executive Officer and Head of Investor Relations and Marketing, respectively, of ACM. Homm had powers of attorney to invest on the Funds' behalf. Defendants (and brothers) Colin and Craig Heatherington were ACM employees who were principals of defendant CIC Global Capital Ltd. ("CIC").[1] Defendant-appellee Todd Ficeto, a resident of California and registered securities agent in California, Florida, Illinois, Massachusetts, New Jersey, New York, Texas, and Washington, was the President, Director, and along with Homm, a co-owner of defendant-appellee Hunter World Markets, Inc. ("Hunter"), the SEC-registered broker-dealer incorporated and based in California with offices in Beverly Hills.

---

[1] The complaint alleges that on or about September 18, 2007, Homm abruptly resigned from ACM "and went into hiding." Am. Compl. ¶ 9. Neither Homm nor defendant CIC has appeared in this action.

The complaint alleges that the defendants engaged in a variation on the classic "pump-and-dump" scheme, causing the Funds to suffer losses of at least $195 million through cycles of fraudulent trading of securities. Defendants' fraud allegedly operated as follows: defendants Homm, Ficeto, Hunter, and Colin Heatherington (collectively, the "Trading Defendants") first caused the Funds to purchase billions of shares of thinly capitalized U.S.-based companies (the "U.S. Penny Stock Companies") directly from those companies. All of these companies were incorporated in the United States and their shares (the "U.S. Penny Stocks") were quoted on the Over-the-Counter Bulletin Board or by Pink OTC Markets, Inc.

Over approximately three years, the Trading Defendants allegedly caused the Funds to purchase the U.S. Penny Stocks directly from those companies in subscriptions pursuant to private offerings known as private investment in public equity ("PIPE") transactions. Acting in their capacity as "placement agents," Homm, Ficeto, and Hunter arranged the financing for these transactions and received placement fees in return. At or around the time of these purchases, the U.S. Penny Stock Companies registered their shares with the SEC.

At the time of each of these initial purchases by the Funds, the Trading Defendants either (1) already held in their own names, or otherwise controlled, substantial amounts of shares and/or warrants of the U.S. Penny Stock Companies, or (2) received shares and/or warrants from the U.S. Penny Stock Companies for little to no money in exchange for causing the Funds to purchase shares from those Companies. After causing the Funds to purchase the U.S. Penny Stocks directly from the U.S. issuers, the Trading Defendants then artificially inflated the prices of those stocks by trading and re-trading the U.S. Penny Stocks, often between and among the Funds, each time trading the stock at a higher price to create the illusion of trading volume. For example, on April 30, 2007, the Trading Defendants allegedly inflated the price of shares of

5

ProElite, Inc. by causing one of the Funds, Absolute Return Europe Fund Limited, to sell 100 shares of ProElite, Inc. at $12 per share -- 6000 times its valuation just six months earlier. Moreover, this fraudulent trading was typically conducted through Hunter in its function as a broker-dealer.

According to the complaint, the purpose of these fraudulent trades was twofold: (1) to generate substantial commissions for Homm, Hunter, and Ficeto, and (2) to artificially inflate the stock price to the point at which the Trading Defendants (together with Craig Heatherington) were free to sell previously locked-up shares and exercise warrants to obtain additional shares, which they then sold to the Funds for a windfall, having obtained the shares or warrants for nothing or almost nothing. Once defendants had manipulated the prices of the U.S. Penny Stocks to the desired levels, the Trading Defendants, Craig Heatherington, and CIC sold the shares they had obtained fraudulently to the Funds at inflated prices.

In addition, Ficeto allegedly created a fraudulent vehicle called The Hunter Fund Ltd., the only investors in which were certain of the Funds. The Hunter Fund invested the Funds' money in some of the U.S. Penny Stock Companies. The Funds derived no benefit from the funneling of their money through The Hunter Fund prior to being invested in the U.S. Penny Stocks. Homm and Ficeto merely used The Hunter Fund to earn additional fees and to make loans to the U.S. Penny Stock Companies.

While the Trading Defendants caused the Funds' money to be invested in the U.S. Penny Stocks, other defendants allegedly raised money from investors in furtherance of the fraudulent scheme. As Head of Investor Relations and Marketing at ACM, defendant Angersbach was responsible for courting investors around the globe, including many in the United States. With knowledge of the fraudulent scheme, Angersbach allegedly encouraged further subscription in

6

the Funds, marketing them heavily in the United States and elsewhere. Similarly, with knowledge of the fraudulent scheme, defendant Ewing allegedly traveled to the United States to meet with investors and potential investors in the Funds and to reassure those investors who were concerned about Homm's disciplinary history. Ewing also allegedly facilitated the fraud by misrepresenting the composition of the Funds' investment to investors.

The complaint alleges that the defendants benefited substantially as a result of the fraudulent scheme and at the expense of the Funds. Homm, Ficeto, and Hunter charged millions in fees and commissions on the Funds' loans to, subscriptions in, and other purchases of shares in the U.S. Penny Stock Companies. After inflating the prices of the U.S. Penny Stocks, Homm, Ficeto, Hunter, Colin Heatherington, Craig Heatherington, and CIC profited by causing the Funds to purchase from them U.S. Penny Stocks that they owned and had acquired for pennies (or less). Angersbach, through a corporate entity he controlled, collected proceeds of at least $8.8 million through sales of his ACM holdings, and Ewing, through a corporate entity he controlled, collected proceeds of $55.3 million. Both Angersbach and Ewing obtained further proceeds by redeeming their holdings in the Funds at a profit. While the defendants reaped enormous profits, the Funds allegedly suffered losses in the amount of $195,916,216.

B.      Procedural History

The Funds filed the initial complaint in this action on October 19, 2009, in the United States District Court for the Southern District of New York. On November 19, 2009, the Funds amended the complaint as of right pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure. The complaint asserted fraud claims under the federal securities laws -- § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §

7

240.10b-5 -- and the common law.[2]  Certain defendants moved to dismiss the complaint in

March and May of 2010 for failure to state a claim, lack of personal jurisdiction, and improper

venue.  Defendants Ficeto and Hunter argued in the alternative that the action should be

transferred to the United States District Court for the Central District of California.

On June 23, 2010, the district court heard oral argument on the motions to dismiss.  On

June 24, 2010, the day after oral argument, the Supreme Court issued its decision in *Morrison*.

Following this decision, although no defendant moved for dismissal under *Morrison*, on

December 22, 2010, the district court dismissed the complaint in its entirety, ruling, *sua sponte*,

that it lacked subject matter jurisdiction over the case pursuant to *Morrison*.  *Absolute Activist*

*Value Master Fund Ltd. v. Homm*, No. 09 Civ. 08862 (GBD), 2010 WL 5415885, *1 & n.3

(S.D.N.Y. Dec. 22, 2010).  The Funds filed a timely notice of appeal on January 20, 2011.

## DISCUSSION

We review *de novo* a district court's dismissal pursuant to Fed. R. Civ. P. 12(b)(1) or

Fed. R. Civ. P. 12(b)(6), "accepting all factual allegations in the complaint as true."  *Ford v.*

*D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam) (reciting standard of

review for Rule 12(b)(1) motion); *Flagler v. Trainor*, 663 F.3d 543, 546 n.2 (2d Cir. 2011)

(reciting standard of review for Rule 12(b)(6) motion).  "To survive a motion to dismiss

[pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true,

---

[2] The complaint asserted a claim for common law fraud and fraud conspiracy against all of the defendants (Count IV) as well as a claim for common law breach of fiduciary duty against defendants Homm and Ewing (Count V).  In a footnote in their opening brief, plaintiffs briefly suggest that the district court erred in dismissing these common law claims.  However, because "[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review," *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993), we deem plaintiffs' argument concerning the common law claims to be forfeited.

8

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, which was promulgated under § 10(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In determining whether § 10(b) and Rule 10b-5 could apply extraterritorially, this Court had previously applied the so-called conduct and effects test, which focused on: "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *See SEC v. Berger*, 322 F.3d 187, 192-93 (2d Cir. 2003). However, in *Morrison*, the Supreme Court rejected the conduct and effects test and held that § 10(b) and Rule 10b-5 do not apply extraterritorially, but only apply to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." 130 S. Ct. at 2884.

9

A. The *Morrison* Decision

In *Morrison*, three Australian plaintiffs sued an Australian bank, National Australian Bank, under § 10(b) of the Exchange Act for losses they allegedly suffered on purchases of the bank's stock on Australian exchanges. *Id.* at 2876. The district court dismissed the foreign plaintiffs' claims for lack of subject matter jurisdiction. *Id.* This Court affirmed, *see Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 177 (2d Cir. 2008), and the foreign plaintiffs successfully sought review in the Supreme Court.

The Supreme Court first dismissed the notion that the extraterritoriality of § 10(b) raises an issue of subject matter jurisdiction and distinguished subject matter jurisdiction, which relates to a "tribunal's power to hear a case," from the "merits question" of whether § 10(b) applies to particular conduct. *Morrison*, 130 S. Ct. at 2877 (internal quotation marks omitted). Thus, the Supreme Court clarified that the district court did, in fact, have jurisdiction under 15 U.S.C. § 78aa to address whether § 10(b) applied to the defendant's conduct. *Id.*

Turning to the merits, the Supreme Court, noting the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States," *id.* at 2877 (internal quotation marks omitted), held that § 10(b) of the Exchange Act does not apply extraterritorially, *id.* at 2883.[3] In so holding, the Supreme Court eschewed the Second Circuit's conduct and effects test in favor of a "transactional test," which provides that § 10(b) only applies to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities." *Id.* at 2884, 2886.

---

[3] Because Rule 10b-5 "was promulgated under § 10(b) and does not extend beyond conduct encompassed by § 10(b)'s prohibition," Rule 10b-5 similarly cannot be applied extraterritorially. *Morrison*, 130 S. Ct. at 2881 (internal quotation marks omitted).

10

"With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . ." *Id.* at 2885.

The case at hand does not concern the first prong of *Morrison* -- whether a transaction involves a security listed on a domestic exchange.[4] Rather, we must interpret *Morrison*'s second prong and determine under what circumstances the purchase or sale of a security that is not listed on a domestic exchange should be considered "domestic" within the meaning of *Morrison*. *See Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 176 (S.D.N.Y. 2010) ("[W]hile *Morrison* held that a domestic purchase or sale is necessary (and, as far as that opinion reveals, sufficient) for section 10(b) to apply to a security that is not traded on a domestic securities exchange, it did not have occasion to discuss what it means for a purchase or sale to be 'made in the United States.'"). For the reasons that we elaborate below, we hold that transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States.

B. Subject Matter Jurisdiction

As an initial matter, the district court erred in dismissing the case for lack of subject matter jurisdiction because *Morrison* makes clear that whether § 10(b) applies to certain conduct

_____

[4] On appeal, the Funds argue that their complaint sufficiently pleads the existence of domestic securities transactions within the second prong of *Morrison* and thus do not address whether their allegations satisfy the first prong of *Morrison*. It is worth noting, however, that in another proceeding, which was brought by the Securities and Exchange Commission ("SEC") against Ficeto, Homm, Colin Heatherington, and Hunter and involves many of the same allegations in the Funds' complaint, the SEC has successfully argued that the first prong of *Morrison* is satisfied because the case involves securities traded on the over-the-counter securities market, not securities sold on foreign exchanges. *See SEC v. Ficeto*, No. 11 Civ. 1637 (GHK), 2011 U.S. Dist. LEXIS 150141, at *31 (C.D. Cal. Dec. 20, 2011) (holding that *Morrison* "did not purport to overturn the universally accepted principle that § 10(b) applies with equal force to market manipulation on national exchanges and the domestic over-the-counter market"). We take no position on this issue.

11

is a "merits" question. *See Morrison*, 130 S. Ct. at 2877. Notwithstanding this "threshold error," *see id.* at 2876-77, all the parties ask us to reach whether the district court erred in dismissing the complaint because it determined that the transactions were not within the territorial reach of § 10(b). *See McGinty v. New York*, 251 F.3d 84, 90 (2d Cir. 2001) (noting that where the parties have fully briefed the questions raised on appeal and the issues "are predominantly of a legal nature," we may decide the substantive issues even though the district court dismissed the case *sua sponte* without notice). Moreover, while the district court dismissed the complaint for lack of subject matter jurisdiction, it indicated in a footnote that dismissal would be "properly granted under Rule 12(b)(6) as well as 12(b)(1)." *Absolute Activist Value Master Fund*, 2010 WL 5415885, at *4 n.6. It is thus clear that "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion." *See Morrison*, 130 S. Ct. at 2877. We now turn to whether the allegations in the complaint are sufficient to allege the existence of domestic transactions.

C. <u>Domestic Purchases and Sales</u>

1. The Meaning of a Domestic Transaction

While *Morrison* holds that § 10(b) can be applied to domestic purchases or sales, it provides little guidance as to what constitutes a domestic purchase or sale. To determine the meaning of a domestic purchase or sale, we first consider how these terms are defined in the Exchange Act. "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13). Similarly, "[t]he terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." *Id.* § 78c(a)(14). While the Supreme Court has previously noted that these definitions "are for the most part unhelpful" because "they only declare generally that the terms 'purchase' and 'sale' shall include contracts to purchase or sell,"

12

*see SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 466 (1969), these definitions nonetheless suggest that the act of purchasing or selling securities is the act of entering into a binding contract to purchase or sell securities. Put another way, these definitions suggest that the "purchase" and "sale" take place when the parties become bound to effectuate the transaction.

Our decision in *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir. 1972), also lends support to the notion that a securities transaction occurs when the parties incur irrevocable liability. In that case, we held that in the context of a civil trial brought pursuant to Rule 10b-5, the district court correctly instructed the jury that "the time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another." *Id.* at 891. "'Commitment' is a simple and direct way of designating the point at which, in the classic contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.*

Given that the point at which the parties become irrevocably bound is used to determine the timing of a purchase and sale, we similarly hold that the point of irrevocable liability can be used to determine the locus of a securities purchase or sale. Thus, in order to adequately allege the existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the plausible inference that the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security. We note that this test has already been adopted and applied by district courts within this circuit. *See SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 159 (S.D.N.Y. 2011); *Plumbers' Union*, 753 F. Supp. 2d at 177.

However, we do not believe this is the only way to locate a securities transaction.  After all, a "sale" is ordinarily defined as "[t]he transfer of property or title for a price."  BLACK'S LAW DICTIONARY 1454 (9th ed. 2009); see also U.C.C. § 2-106(1) ("A 'sale' consists in the passing of title from the seller to the buyer for a price.").  Thus, a sale of securities can be understood to take place at the location in which title is transferred.  Indeed, the Eleventh Circuit has held that, in order to survive a motion to dismiss premised on *Morrison*, it is sufficient for the plaintiff to allege that title to the shares was transferred within the United States.  *See Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) ("Given that the Supreme Court in *Morrison* deliberately established a bright-line test based exclusively on the location of the purchase or sale of the security, we cannot say at this stage in the proceedings that the alleged transfer of title to the shares in the United States lies beyond § 10(b)'s territorial reach.").  Accordingly, to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, we hold that a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States.

We now turn briefly to the reasons we reject other potential tests proposed by the parties.  Plaintiffs suggest that the location of the broker-dealer should be used to locate securities transactions.  While we agree that the location of the broker could be relevant to the extent that the broker carries out tasks that irrevocably bind the parties to buy or sell securities, the location of the broker alone does not necessarily demonstrate where a contract was executed.  Next, plaintiffs assert that the identity of the securities should be used to determine whether a securities transaction is domestic and that where, as in this case, the securities are issued by United States companies and are registered with the SEC, the transactions are domestic within the meaning of *Morrison*.  However, the plaintiffs' argument is belied by the wording of the test announced in

14

*Morrison*. The second prong of that test refers to "domestic transactions in other securities," *Morrison*, 130 S. Ct. at 2884, not "transactions in domestic securities" or "transactions in securities that are registered with the SEC." Thus, we cannot conclude that the identity of the security necessarily has any bearing on whether a purchase or sale is domestic within the meaning of *Morrison*.[5]

Defendants Ficeto, Hunter, and Colin Heatherington argue that the identity of the buyer or seller should be used to determine whether a transaction is domestic. Where the buyer and seller are both foreign entities, these defendants argue that a transaction cannot be considered domestic. Under this test, the second type of transaction at issue in this case -- the transactions between and among the Funds themselves -- would not be domestic.[6] While it may be more likely for domestic transactions to involve parties residing in the United States, "[a] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States." *Plumbers' Union*, 753 F. Supp. 2d at 178.

Finally, we consider defendant Ewing's argument that despite the Supreme Court's rejection of the conduct and effects test in favor of a transactional approach, it is still necessary to determine whether each individual defendant engaged in at least some conduct in the United States. Specifically, Ewing contends that even if the U.S. Penny Stock transactions occurred in the United States, it would still be impermissible to apply § 10(b) to him since he did not

---

[5] Of course, pursuant to the first prong of *Morrison*, § 10(b) does apply to transactions in securities that are listed on a domestic exchange. *Morrison*, 130 S. Ct. at 2884.

[6] While arguing in their reply brief that the identity of the buyer or seller is irrelevant under *Morrison*, the plaintiffs suggest in their opening brief that because the sellers of the U.S. Penny Stocks were United States companies, the Funds' initial purchases of the U.S. Penny Stocks were domestic purchases.

15

personally engage in any conduct in the United States. Ewing's lack of contact with the United States may provide a basis for dismissing the case against him for lack of personal jurisdiction -- an argument the district court will consider on remand -- but the transactional test announced in *Morrison* does not require that each defendant alleged to be involved in a fraudulent scheme engage in conduct in the United States. Accordingly, rather than looking to the identity of the parties, the type of security at issue, or whether each individual defendant engaged in conduct within the United States, we hold that a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.

2. Whether the Complaint Adequately Alleges Domestic Transactions

Having explained what constitutes a domestic transaction, we now turn to whether the complaint alleges facts giving rise to the plausible inference that irrevocable liability was incurred or title was transferred within the United States. The Funds principally argue that because the PIPE offerings described in the complaint were not transactions on a foreign exchange, but *direct* sales by U.S. companies to the Funds, the complaint sufficiently alleges the existence of domestic purchases. However, upon careful review of the complaint, we conclude that the allegations do not sufficiently allege that purchases or sales took place in the United States.

In the sixty-one page complaint, there are only a few allegations that mention or even hint at the location of the securities transactions at issue in this case. The sole allegation that affirmatively states that the transactions took place in the United States only does so in conclusory fashion: "The fraudulent transactions that Defendants carried out through Hunter took place in the United States." Am. Compl. ¶ 21(i). Absent factual allegations suggesting that the Funds became irrevocably bound within the United States or that title was transferred within

16

the United States, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money, the mere assertion that transactions "took place in the United States" is insufficient to adequately plead the existence of domestic transactions. The complaint alleges that investors subscribed to the Funds by wiring money to a bank located in New York. However, this allegation, even if true, is inapposite as the case before us was brought by the Funds themselves and is based on the Funds' purchases and sales of U.S. Penny Stocks rather than individual investors' subscriptions to the Funds. Similarly, allegations that the Funds were heavily marketed in the United States and that United States investors were harmed by the defendants' actions, while potentially satisfying the now-defunct conduct and effects test, *see Morrison*, 547 F.3d at 171, do not satisfy the transactional test announced in *Morrison*.

The complaint also alleges that, at all relevant times, defendant Ficeto was a resident of Malibu, California and defendant Hunter was a California corporation with offices in Beverly Hills. However, the fact that two of the defendants resided in California does not lead to the plausible inference that the Funds became irrevocably bound to purchase U.S. Penny Stocks in the United States. Indeed, the complaint alleges that Colin Heatherington and Florian Homm, the other Trading Defendants who purportedly played a role in effectuating the transactions, never resided in the United States. And, in any case, for the reasons discussed above, a party's residency or citizenship is irrelevant to the location of a given transaction. While the complaint further alleges that Hunter "was an underwriter for, or was otherwise involved, in the offerings of the U.S. Penny Stock Companies whose shares Defendants caused the Funds to purchase," *id.* ¶ 11, absent more detailed factual allegations about Hunter's role in the transactions, this allegation is also insufficient to demonstrate that the transactions occurred in the United States. Similarly, the allegation that "Ficeto carried out his fraudulent activities and caused Hunter to

17

carry out its fraudulent activities in, among other places, the United States," *id.* ¶ 21(ii), does not sufficiently allege that the transactions themselves took place in the United States. As the Supreme Court held in *Morrison*, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." 130 S. Ct. at 2884.

Finally, while the complaint alleges that the U.S. Penny Stocks were issued by United States companies and were registered with the SEC, these facts do not demonstrate that the purchases and sales were "made in the United States." *See id.* at 2886. Accordingly, we conclude that the complaint fails to state claims under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder because it does not adequately allege the existence of domestic securities transactions.

3. Leave to Amend

We now address whether the Funds should be given leave to amend their complaint. Pursuant to Rule 15 of the Federal Rules of Civil Procedure, a "court should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a request to replead should be denied in the event that amendment would be futile. *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 127 (2d Cir. 2007).

In this case, we conclude that the Funds should be given leave to amend their complaint. We first observe that the Funds' complaint was filed before the Supreme Court issued its decision in *Morrison* and before this Court provided guidance about how to adequately plead a domestic purchase or sale. It appears as though the complaint was drafted to satisfy the conduct and effects test, which was in operation when the complaint was filed. After all, the complaint alleges, among other things, that Ficeto and Hunter carried out their fraudulent activities in the

18

United States, that the defendants marketed the Funds in the United States, and that United States investors were injured by the fraud. Given that the Funds understandably drafted their complaint in accordance with pre-*Morrison* doctrine, they cannot be faulted for their failure to allege facts suggesting that irrevocable liability was incurred within the United States.

Of course, notwithstanding the change in doctrine, it would not be appropriate to grant leave to amend if doing so would be futile. In this case, however, we cannot conclude that amendment would be futile given the Funds' representations made both in their briefs and at oral argument that additional facts could be alleged to show that the transactions were domestic. For example, in their reply brief, the Funds represent that the underlying transactional documents, which are not currently part of the record in this case, demonstrate that the transactions occurred in the United States. Moreover, during oral argument, the Funds claimed to possess trading records, private placement offering memoranda, and other documents indicating that the purchases became irrevocable upon payment and that payment was made through Hunter in the United States. Given these representations, we direct the district court to grant the plaintiffs leave to amend their complaint in order to plead additional factual allegations to support their claim that the transactions took place in the United States.

D. Alternate Grounds for Dismissal

Certain of the defendants-appellees contend that the dismissal of the complaint can be affirmed on various alternate grounds, including (1) that the statute of limitations has elapsed, (2) lack of personal jurisdiction, and (3) failure to state a claim upon which relief can be granted. Because the district court did not consider these arguments in the first instance, we remand to the district court to determine whether dismissal is appropriate on any of these alternate grounds. *Baker v. Dorfman*, 239 F.3d 415, 420 (2d. Cir. 2000) ("[A] federal appellate court does not

19

consider an issue not passed upon below.") (internal quotation marks omitted).  On remand,

following the filing of the Funds' amended complaint, the district court may consider whether

dismissal is appropriate on these grounds or any other ground raised by the defendants in

response to the amended complaint.

## CONCLUSION

Accordingly, the district court's judgment is **AFFIRMED** in part, **REVERSED** in part,

and **REMANDED** for further proceedings consistent with this Opinion.