**In re OPTIMAL U.S. LITIGATION.**

**No. 10 Civ. 4095(SAS).**

United States District Court,
S.D. New York.

June 4, 2012.

Edward W. Miller, Esq., Garden City, NY, Alan Ian Ellman, Esq., Javier Bleichmar, Esq., Labaton Sucharow, LLP, New York, NY, Jack Reise, Esq., Michael L. Greenwald, Esq., Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, for Plaintiffs.

Gustavo J. Membiela, Esq., Samuel A. Danon, Esq., Hunton & Williams, LLP, Brickell Avenue, Miami, FL, Paulo Roberto Lima, Esq., Shawn Patrick Regan, Esq.,

Hunton & Williams, LLP, New York, NY, for Defendants.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

This putative class action arises out of plaintiffs' investment in the Optimal Strategic U.S. Equity Fund ("Optimal U.S." or the "Fund"), which in turn invested one-hundred percent of its assets with Bernard L. Madoff and his firm, Bernard L. Madoff Investment Securities LLC ("BMIS"). Plaintiffs allege that defendants failed to conduct adequate diligence regarding Madoff, ignored "red flags" that should have alerted them to Madoff's fraud, and made misstatements and omissions in connection with the sale of Optimal U.S. shares, causing plaintiffs to lose their investments and allowing defendants wrongfully to collect management fees.[1]

On May 2, 2011, I granted in part defendants' motion to dismiss plaintiffs' Second Amended Complaint ("SAC") for improper forum, lack of standing, and failure to state certain claims.[2] I held, in pertinent part, that plaintiffs had adequately pled application of the Exchange Act by alleging that "[t]he purchases and sales of the shares of [Optimal U.S.] by Plaintiffs and the Class took place in the United States."[3] I reasoned that plaintiffs' allegation was supported by a Contract Note issued to a non-party stating that "WE BOUGHT [SOLD] FOR YOUR ACCOUNT IN: NYS."[4] Finally, I noted that defendants' *Morrison* argument was better resolved "in the context of a more fully-developed factual record that unequivocally establishes where all of Plaintiffs' shares were 'issued.'"[5]

On March 6, 2012, I issued an Order to Show Cause why the federal securities law claims should not be dismissed in light of the Second Circuit's decision in *Absolute Activist Value Master Fund, Ltd. v. Ficeto*,[6] which clarified the scope of extraterri-

---

1. Defendants include (1) Optimal U.S.'s investment manager, Optimal Investment Management Services, S.A. ("OIS"); (2) an employee thereof, Jonathan Clark; and (3) OIS's corporate parent, Banco Santander, S.A. ("Banco Santander"). Plaintiffs include (1) Pioneer International Ltd. ("Pioneer"), an investment advisory firm incorporated in the British Virgin Islands; (2) the "Pioneer Plaintiffs," fifty-six non-U.S. persons and entities who invested in Optimal U.S. based on advice provided by Pioneer (whose advice was in turn based on Defendants' misrepresentations); (3) the "Santander Plaintiffs," three foreign citizens/non-U.S. residents to whom Banco Santander International ("Santander U.S.") marketed and sold Optimal U.S., and who held their Optimal U.S. investments in accounts with non-party Santander Bank & Trust, Ltd. in the Bahamas ("SBT Bahamas" or "SBT"); and (4) Silvana Worldwide Corp. ("Silvana"), a Plaintiff who invested in Optimal U.S. from a non-Santander-affiliated bank account. *See In re Optimal U.S. Litig.*, 813 F.Supp.2d 351, 356–57 (S.D.N.Y.2011)

("May 2 Opinion"); Fourth Amended Complaint ("FAC") ¶ 64.

2. *See* May 2 Opinion, 813 F.Supp.2d at 363–83. Defendants' motion to dismiss Plaintiffs' claims under the Securities Exchange Act of 1934 ("Exchange Act") was denied at a conference held on May 10, 2011. *See* Transcript of 5/10/11 Conference ("5/10/11 Tr") [Docket No. 36]. This Opinion assumes familiarity with the background and applicable law of this case, as stated in the May 2 Opinion and the May 10 bench ruling.

3. May 2 Opinion, 813 F.Supp.2d at 371 (quoting Second Amended Complaint ¶ 352) (alterations in original).

4. *Id.* at 373 (quoting 4/15/11 Pl. Letter at 1; Contract Notes, Ex. A to 4/15/11 Letter; Certification of Inversiones Mar Octava, Ex. B to 4/15/11 Letter).

5. *Id.*

6. 677 F.3d 60 (2d Cir.2012).

torial application of the Exchange Act. In a letter dated May 17, 2012, plaintiffs—after concluding discovery related to the location of plaintiffs' transactions in Optimal U.S.—withdrew their "allegations that the purchases or sales of Optimal U.S. shares took place in the United States."[7]

Plaintiffs now contend that the Exchange Act reaches their claims for two reasons: (1) plaintiffs' purchase of U.S. Optimal shares was "in connection with" Madoff's purported trades in the United States; and (2) the "economic reality" of plaintiffs' Optimal U.S. investments consisted of Madoff's purported transactions in the United States.[8] For the reasons discussed below, plaintiffs' federal securities law claims are now dismissed.

## II. EXTRATERRITORIAL APPLICATION OF THE EXCHANGE ACT

■ "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."[9] The second prong of *Morrison* ("the purchase or sale of any other security in the United States") has presented many questions of interpretation for lower courts.

■ The Second Circuit recently clarified the second prong of *Morrison* holding that "to sufficiently allege the existence of a 'domestic transaction in other securities,' plaintiffs must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."[10] After looking at the Exchange Act definitions for "purchase" and "sale," the Second Circuit noted that "that the 'purchase' and 'sale' take place when the parties become bound to effectuate the transaction,"[11] thereby equating "irrevocable liability" with entering into a binding contract.

## III. DISCUSSION

Plaintiffs essentially concede that their claims do not satisfy the standard for extraterritorial application of the Exchange Act under *Absolute Activist's* interpretation of the second prong of *Morrison* because they cannot show that "irrevocable liability was incurred ... within the United States" or that "title was transferred in the United States" with respect to plaintiffs' purchases of Optimal U.S. shares.[12] Rather, plaintiffs now claim that the Exchange Act reaches their claims because their purchases of Optimal U.S. shares were "*in connection with* the purchase or sale of a security listed on an American stock exchange"—namely, Madoff's purported trades on the New York Stock Exchange ("NYSE").[13]

### A. "In Connection with"

■ Plaintiffs contend that, under a textual reading *of Morrison,* the purchase of Optimal U.S. shares was "in connection with" Madoff's purported purchases and

---

7. 5/17/12 Pl. Letter [Docket No. 153] at 1.

8. *Id.*

9. *Morrison v. National Australia Bank Ltd.,* —— U.S. ——, 130 S.Ct. 2869, 2888, 177 L.Ed.2d 535 (2010).

10. *Absolute Activist Value Master Fund,* 677 F.3d 60 (quoting *Morrison,* 130 S.Ct. at 2884).

11. *Id.*

12. *Id.; see also* 5/17/12 Pl. Letter at 1 (stating that plaintiffs no longer allege that "Optimal U.S. shares were purchased and sold in the United States").

13. *Morrison,* 130 S.Ct. at 2888 (emphasis added).

sales of NYSE-listed stocks.[14] Plaintiffs rely on the broad interpretation generally given to the phrase "in connection with" in Section 10(b) decisions.[15] In short, this argument fails because plaintiffs rely on opinions construing "in connection with" outside of the *Morrison* context, which thereby ignores the presumption against applying securities laws extraterritorially.

In particular, plaintiffs point to *SEC v. Wyly*, where I rejected defendants' argument that "security-based swap agreements were not included within the Exchange Act's definition of a 'security' and were not otherwise subject to section 10(b) or Rule 10–5"[16] reasoning that a

> swap agreement like this one—which explicitly required the purchase of stock by Lehman and called for the Wylys' offshore entities to pay the transaction costs associated with those purchases—clearly "touches on" and "coincides" with the purchase or sale of securities so as to satisfy the "in connection with" requirement, regardless of whether the Wylys themselves purchased or sold the securities.[17]

*Wyly* is not dispositive here. *Wyly* never considered the extraterritorial application of the Exchange Act. Rather, it considered whether a novel theory for insider-trading liability advanced by the SEC based on stock-based swap agreements[18] was sufficiently "in connection with" the purchase or sale of securities to be viable. As discussed below, the phrase "in connection with" cannot be construed as broadly in the context of the extraterritorial reach of the Exchange Act as it is construed in *Wyly* because there is a presumption against extraterritorial application of the Exchange Act.

Relying partly on *Wyly*, Judge Denise Cote held that purchases in the United Kingdom of contracts for difference ("CFD") referencing NYSE-listed shares were within the scope of Section 10(b) under *Morrison* because they were "in connection with" the purchases of shares on the NYSE.[19] Although this decision does, in fact, interpret "in connection with" to extend the Exchange Act to a foreign transaction in a foreign instrument, plaintiffs give *Compania* a broader reading than is warranted. *Compania* noted that "the central issue here is insider trading in the domestic securities of Arch stock listed on the NYSE" and that the CFDs were functional equivalents of the NYSE-listed

14. *Id.*

15. *See Merrill Lynch v. Dabit*, 547 U.S. 71, 85, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ("[W]hen this Court has sought to give meaning to the phrase [in connection with] in the context of § 10(b) and Rule 10b–5, it has espoused a broad interpretation.").

16. 788 F.Supp.2d 92, 119 (S.D.N.Y.2011). The transactions at issue in *Wyly* pre-dated the Commodity Futures Modernization Act of 2000, which amended Section 10(b) to explicitly cover securities-based swap agreements. *See id.*

17. *Id.* at 120.

18. Specifically, I held that the SEC stated a viable cause of action by alleging that because defendants "benefitt[ed] personally through fraudulent use of material, nonpublic information about Sterling Software's planned sale without disclos[ing] [that information] prior to trading, they breached their obligation to place [Sterling Software shareholders'] welfare before their own. In particular, they placed their welfare ahead of the Sterling Software shareholders who sold on the opposite side of Lehman's hedging purchases, purchases that were a known requirement of the swap agreement that constituted their trading." *Id.* at 122 (quotations and citations omitted).

19. *See SEC v. Compania Internacional Financiera, S.A.*, No. 11 Civ. 4904, 2011 WL 3251813 (S.D.N.Y. July 29, 2011).

stock because "CFD holders receive the benefit of dividends paid by the company on shares and CFD contracts may include voting rights on the shares." [20] In addition, "prices for CFDs are the prices for the common stock that is traded on the American exchange, and any profits or damages that holders of CFDs experience are identical to those experienced by holders of the common stock." [21]

Even if *Compania* is correct in holding that the Exchange Act may reach CFDs "in connection with" U.S.-listed stocks based on the facts in *Compania,* the relationship between Optimal U.S. shares and NYSE-listed stocks is much more attenuated. The strategy disclosed in the EMs authorized the purchase of a wide range of instruments not listed on a U.S. stock exchange—commercial paper, certificates of deposit, bankers' acceptances, and shares in money market mutual funds. With respect to NYSE stocks, the EMs authorized Madoff to purchase a basket of up to forty unspecified stocks, then purchase put options and sell call options on those same securities. Given the complex strategy disclosed in the EMs, the lack of evidence concerning how this strategy played out in practice because no such trades were ever actually consummated, and the lack of a direct correlation between Optimal U.S. shares and shares listed on the NYSE, it would disregard *Morrison's* presumption to extend the holding in *Compania* to reach the allegations here.

Finally, plaintiffs argue that other Madoff feeder fund cases have satisfied the "in connection with" requirement in the Securities Litigation Uniform Standards Act ("SLUSA"). [22] However, plaintiffs' reliance on SLUSA decisions is misplaced. The policy considerations guiding the application of SLUSA differ greatly from those concerning the extraterritorial application of the Exchange Act. SLUSA is applied broadly to effectuate Congress's purpose "to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PLSRA]." [23] Given the presumption against extraterritorial application of the Exchange Act, it would contravene the reasoning of *Morrison* to interpret the language "in connection with" broadly to extend the reach of the Exchange Act.

## B. Economic Reality Test

In addition to their textual argument, plaintiffs also raise a functional argument based on *Morrison's* first prong. Plaintiffs argue that the "economic reality" of plaintiffs' purchase of Optimal U.S. shares was essentially an investment in the NYSE. Plaintiffs rely heavily on *Elliott Associates v. Porsche Automobil Holding,* [24] in which Judge Harold Baer, Jr. dismissed claims based on a swap agreement signed in New York which referenced Volkswagen shares traded on a German exchange. The court held that the "swap agreements, which referenced VW shares, \were economically equivalent to the purchase of VW shares." [25]

Without determining the viability of the "economic reality" test, which the Second Circuit will consider in due course, [26] I con-

**20.** *Id.* at *6.

**21.** *Id.*

**22.** *See, e.g., In re Merkin,* 817 F.Supp.2d 346, 358–62 (S.D.N.Y.2011).

**23.** *Dabit,* 547 U.S. at 86, 126 S.Ct. 1503.

**24.** 759 F.Supp.2d 469 (S.D.N.Y.2010), *appeal docketed,* No. 11–397.

**25.** *Id.* at 476.

**26.** Oral arguments were held in *Elliott* on February 24, 2012. Because I do not believe the Second Circuit's decision in *Elliott* will be

clude that such a test, would not sustain plaintiffs' federal securities law claims here for two reasons. *First*, the economic reality test was applied in *Elliott* based on *Morrison's* presumption against extraterritorial application of the Exchange Act.[27] Here, plaintiffs seek to use the test to *expand* the reach of the Exchange Act by applying it in the reverse situation, where private parties with little relation to the United States can enter into agreements referencing U.S. securities and take advantage of the benefit of U.S. laws.[28]

*Second, Valentini* and *Elliott* are distinguishable on the grounds that they involve securities that had a direct, one-to-one relationship with the U.S. security referenced, and the security at issue in those cases fluctuated in value in direct correlation with the value of the U.S. security. As discussed with respect to *Compania*, the relationship between Optimal U.S. shares and shares listed on the NYSE is highly attenuated (and hypothetical). Therefore, the purchase of Optimal U.S. shares is not "economically equivalent" to the purchase of stock on the NYSE, such that the presumption against extraterritorial application of the Exchange Act is trumped. Even assuming that the "economic reality" test survives *Absolute Ac-*

*tivist,* it does not provide a basis to sustain plaintiffs' federal securities law claims.

The issue of the extent to which the Exchange Act may reach foreign instruments referencing U.S. stock is an issue that many district courts have grappled with and which requires further guidance from appellate courts. However, given that plaintiffs' federal securities law claims fail to satisfy the standard in *Absolute Activist* and their extremely tenuous and speculative connection to securities listed on a U.S. stock exchange, plaintiffs have failed to overcome the presumption against the extraterritorial reach of the Exchange Act.

## IV.  CONCLUSION

For the foregoing reasons, plaintiffs' federal securities law claims (Counts XII, XIII, and XV) are dismissed. The following claims remain in this action: common law fraud and negligent misrepresentation against OIS, Clark, and Banco Santander (Counts I–IV); aiding and abetting fraud against Banco Santander (Count VIII).

SO ORDERED:

---

dispositive of the issues in this case, I deny plaintiffs' request that I wait for the Second Circuit's decision in *Elliott* before issuing this opinion.

27.  *See id.* ("I am loathe to create a rule that would make foreign issuers with little relationship to the U.S. subject to suits here simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stock. Such a holding would turn *Morrison's* presumption against extraterritoriality on its head.").   .

28.  Although I recognize that Judge Leonard Sand has applied the economic reality test to extend the reach of the Exchange Act to for-

eign parties entering into a transaction referencing U.S. securities, I cannot reconcile this holding with the presumption against extraterritoriality in *Morrison*. *See Valentini v. Citigroup, Inc.,* 837 F.Supp.2d 304, 323–24 (S.D.N.Y.2011). To the extent that a broad reading of *Morrison* may raise policy concerns that parties will engage in foreign transactions to avoid the reach of the Exchange Act, Congress has attempted to remedy that problem by restoring the conducts and effects test for SEC enforcement actions. *See* Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111–203, § 929P(b)(2), 124 Stat. 1376, 1862 (2010). In addition, I note that *Valentini* pre-dates *Absolute Activist*.