**ARCO CAPITAL CORPORATIONS LTD., Plaintiff,**

v.

**DEUTSCHE BANK AG, Defendant.**

No. 12 Civ. 7270.

United States District Court, S.D. New York.

June 6, 2013.

Miller & Wrubel P.C., by: John G. Moon, Esq., Claire L. Huene, Esq., New York, NY, for Plaintiffs.

Jones Day, by: Jayant W. Tambe, Esq., Kelly A. Carrero, Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

Defendant Deutsche Bank AG ("Deutsche Bank" or the "Defendant") has moved pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint (the "Complaint") of plaintiff Arco Capital Corporation Ltd. ("Arco" or the "Plaintiff").

Upon the conclusions set forth below, the motion of Deutsche Bank to dismiss the cause of action for securities fraud is granted with leave to replead within 20 days, and supplemental jurisdiction over Arco's state law claim is declined.

## I. *Prior Proceedings*

On September 27, 2012, Arco filed the Complaint setting forth two causes of action against Deutsche Bank for (1) securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and (2) for breach of contract.

On December 3, 2012, invoking Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Deutsche Bank moved to dismiss the Complaint. The instant motion was heard and marked fully submitted on January 16, 2013.

## II. *Background*

The following factual background is drawn from the Complaint and from documents referenced in or integral to the Complaint as submitted by the parties. The allegations of the Complaint are accepted as true for the purposes of this motion, *see Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002), and do not constitute findings of fact by the Court.

This action arises out of Deutsche Bank's allegedly intentional or reckless misconduct in connection with a June 2006 collateralized loan obligation ("CLO") transaction (the "Transaction"), known as CRAFT EM CLO 2006–1 (the "CRAFT EM CLO" or the "Issuer"). (Compl. ¶ 1).

Deutsche Bank is a financial institution organized and existing under the laws of Germany with its principal place of business in the United States in New York, New York. (*Id.* ¶ 15).

Arco is an exempted limited company organized and existing under the laws of the Cayman Islands and externally managed by a company with its principal place of business in Guaynabo, Puerto Rico. (*Id.* ¶ 14).

*The Transaction*

In June 2006, Deutsche Bank offered investors the opportunity to acquire debt securities (the "Notes") tied to a portfolio (the "Reference Portfolio") of Deutsche Bank-originated emerging markets investments and derivative transactions (the "Reference Obligations"). (*Id.* ¶ 2). The transactions were effected through CRAFT EM CLO, a Cayman Islands company created by Deutsche Bank. (*Id.* ¶¶ 2–4, 30, 77). As a "synthetic" CLO, the Craft EM CLO did not go out and purchase outright whole loans or other direct exposures to the emerging market companies or derivatives counterparties; instead, it gained exposure synthetically through credit default swap transactions (the "CDS Agreements"), which the Issuer entered into with Deutsche Bank. (*Id.* ¶¶ 2–3, 31–43; Exs. 14–17 [Swap Confirmations]).

In exchange for the interest payments on the Notes, investors agreed to risk the principal due on the Notes based on the Reference Portfolio. If a Reference Obligation defaulted in a way covered by the CDS Agreements (a "Credit Event"), Deutsche Bank received a payment (a "Credit Event Payment"), which directly reduced the principal due on the Notes at maturity. (*Id.* ¶ 3).

The Notes were issued in tranches with different levels of seniority: Class E, Class F and Class G Notes, with Class G as the most junior. (*Id.* ¶ 4). The Class E–1, F–1, and G–1 Notes were issued in June 2006 (the "First Offering"), and the Class E–2, F–2, and G–2 Notes were issued in January 2007 (the "Second Offering"). (*Id.* ¶¶ 1, 5, 31, 34, 77, 81). All classes of Notes were scheduled to mature on July 15, 2012. (*Id.* ¶ 10).

According to Arco, Deutsche Bank caused the Issuer to enter into an Indenture, dated June 21, 2006 (the "Indenture") with HSBC Bank USA, N.A. ("HSBC"), located in New York, as Trustee. (*Id.* ¶ 5). Arco alleges that Deutsche Bank controlled the transactions from its offices in New York, that all funds went to and from HSBC in New York, and that investors purchased the Notes by delivering funds to HSBC. (*Id.*).

In June 2006, during the First Offering, Gramercy Emerging Markets Fund ("Gramercy"), a company associated with Arco, purchased Class F and Class G Notes on Arco's behalf. (*Id.* ¶¶ 81–82). During the Second Offering in January 2007, Gramercy purchased new Notes on behalf of Arco. (*Id.* ¶ 83). Gramercy, as the alleged agent for Arco, purchased Class G–1 Notes with an original notional amount of $15 million, Class G–2 Notes with an original notional amount of $15 million, Class F–1 Notes with an original notional amount for $8.75 million, and Class F–2 Notes with an original notional amount for $17.5 million. (*Id.*). In total, Gramercy purchased a total of $56.25 million of the Class G and Class G Notes during the First Offering and Second Offering. (*Id.*). In May 2007, Gramercy transferred the Notes to Arco in a pass-through transaction, in which Arco reimbursed Gramercy at par for the amounts Gramercy had advanced to purchase the Notes. (*Id.* ¶ 84).

*The Representations and Warranties by Note Purchasers*

In connection with the purchase of the Notes, Gramercy executed a separate note subscription agreement (the "Note Subscription Agreement") with the Issuer. (*Id.* ¶ 61). The Note Subscription Agreement became an irrevocable agreement between Gramercy and the CLO, stating that:

> This subscription by the Purchaser is irrevocable; provided, however, that the execution and delivery by the Purchaser of this Subscription Agreement will not constitute an agreement between the Company and the Purchaser until this Subscription Agreement is accepted on behalf of the Company and, if not so accepted (as described below), this subscription and the obligations of the Purchaser hereunder will terminate.

(Exs. 8–11 at § 1(b) [Note Subscription Agreements] ).

On or before the closing date of each issuance, each Note Subscription Agreement was agreed to and accepted in the Cayman Islands by a director of the CLO employed by the CLO's "Administrator," Maples & Calder, a Cayman Islands law firm. (Exs. 8–11 at Signature Pages [Note Subscription Agreements]; Ex. 12 at § 2.4 [Administration Agreement]; Ex. 13[Registers of Directors and Officers] ). The Administration Agreement required them to "perform all services and take all actions in connection with [the transaction] in or from within the Cayman Islands." (Ex. 12 at § 2.9 [Administration Agreement] ). Deutsche Bank was not a party to any of the Note Subscription Agreements, but was expressly identified as a third party beneficiary. (Exs. 8–11 at § 17 [Note Subscription Agreements] ).

In Section 4 of each Note Subscription Agreement, Gramercy made several representations and warranties, including that:

- It "received the Indenture and the other Transaction Documents and has not relied on any information ... other than information that is contained in, and the terms and provisions of, the Indenture and the other Transaction Documents or is otherwise available."
- It "has made its own investment decisions based upon its review of the Indenture and the other Transaction Documents, its own judgment and upon any advice from such advisers as it has deemed necessary...."
- It acknowledged that the Notes had been sold pursuant to Regulation S ("Reg S") of the Securities Act of 1933 (the "1933 Act"), an exemption from the registration requirements of Section 5 of the 1933 Act for offshore securities offerings.

(Exs. 8–11 at § 4(e)-(i) [Note Subscription Agreements].)

*The CDS Agreements*

The CDS Agreements applied to the Reference Portfolio, which started at $500 million in size. (Compl. ¶ 1). In January 2007, the Swap Confirmations were amended and the Reference Portfolio's size doubled to $1 billion (the "Upsize") (*Id.* ¶ 10). At that time, the definition of "Reference Obligation" was expanded to include "Specified Payment Obligations," which in turn was defined to include certain derivative transactions and "a senior secured or unsecured note of the Reference Entity issued pursuant to an indenture or equivalent instrument." (*Id.* ¶ 77; *compare* Exs. 14–15 at § 1 [2006 Swap Confirmations], *with* Exs. 16–17 at §§ 1 and 3 [2007 Amended Swap Confirmations]).

Deutsche Bank had sole discretion to select the Reference Obligations to add to the Reference Portfolio. (Compl. ¶¶ 7, 36, 178(d)). Each Reference Obligation was required to meet the following qualifications (the "Eligibility Criteria"), on the date it was first included in the Reference Portfolio, and on the date of any replenishment that increased the notional amount of the Reference Obligation (the "Relevant Date"): (1) the underlying company (the "Reference Entity") would satisfy the credit rating thresholds (e.g., Moody's Equivalent Rating of "B3" or better); (2) the Reference Obligation could meet origination requirements (e.g., an eligible asset type and originated by Deutsche Bank "in accordance with its standard credit policies and guidelines"); (3) there was no known event that with notice or lapse of time would become a Credit Event in relation to the Reference Obligation; (4) the Reference Obligation was legally valid and enforceable in accordance with its terms and applicable provisions of law; and (5) the Reference Obligation was held by or for the benefit of a Deutsche Bank entity. (Compl. ¶¶ 37, 44–56; Exs. 14–17 at ¶ 1, C [Swap Confirmations]).

Under the first Eligibility Criteria, a Reference Entity had to meet certain minimum credit rating thresholds, including holding a Moody's Equivalent Rating of "B3" or better. (Exs. 14–17 at C [Swap Confirmations]). For any unrated Reference Entity, Deutsche Bank would ascribe an internal rating to that Reference Entity. (Compl. ¶¶ 21, 47–48). The rating agencies provided "mapping tables" to determine the corresponding Moody's or Standard & Poor's ("S & P") rating to Deutsche Bank's internal ratings, which would be used to determine the "Moody's Equivalent Rating" and "S & P Equivalent Rating," as defined in the CDS Agreements. (*Id.* ¶¶ 22, 49, 60, 97; Exs. 14–17 at E [Swap Confirmations]).

As "Calculation Agent" under the Swap Confirmations, Deutsche Bank was required to engage an independent accountant, Ernst & Young LLP ("E & Y"), to deliver an irrevocable notice to the Issuer

containing a certification, as a condition precedent to Deutsche Bank's entitlement to any claimed Credit Event Payment. (*Id.* ¶¶ 41–42, 89–96; Exs. 14–17 at ¶ 4 [Swap Confirmations] ). The certification was to include: (a) that the defaulted Reference Obligation satisfied the Eligibility Criteria and Replenishment Conditions; (b) verification that the related Credit Event occurred; and (c) verification that the computation of the relevant "Loss Determination Amount" (each, an "E & Y Certification"). (Exs.. 14–17 at ¶ 4 [Swap Confirmations] ). The E & Y Certifications were drafted by E & Y in accordance with "agreed upon procedures" and provided that they were "in accordance with attestation standards established by the American Institute of Certified Public Accountants [ ("AICPA") ]." (Compl. at Ex. B).

### III. *Arco's Allegations and Claims*

Arco brings a securities fraud claim under Section 10(b) and Rule 10b–5(a) and (c) for "scheme liability" arising out of the same operative facts as the contract claim and seeks to recoup the losses it allegedly suffered. Arco's allegations are predicated on seventeen Reference Obligations that Deutsche Bank designated after the Second Offering in January 2007 and that later suffered Credit Events. (*Id.* ¶¶ 11, 80).

First, as a basis for its fraud and contract claim, Arco contends that the assets that suffered Credit Events were ineligible under the Eligibility Criteria. (*Id.* ¶¶ 106–62, 168–69, 178(c)). As discussed above, upon default of each Reference Obligation, as provided for under the CDS Agreements, the Issuer was required to make a Credit Event Payment to Deutsche Bank. (*Id.* ¶ 3–4, 69–70). Each Credit Event Payment correspondingly reduced the amount of funds available to repay the principal balance due on the Notes at maturity. (*Id.* ¶ 6). According to Arco, at the time of the Upsize, Deutsche Bank faced more stringent regulatory capital requirements and had poorly-written and toxic investments on its books, particularly its derivative investments. (*Id.* ¶¶ 76). Arco alleges that Deutsche Bank knew that such investments did not meet the Eligibility Criteria, and secretly intended to use the Upsize to rid itself of such assets and shift the losses to Arco. (*Id.*). Deutsche Bank allegedly took advantage of the Upsize to dump ineligible lending transactions into the Reference Portfolio, and used its control over the Transaction to disguise its misconduct and frustrate the protections that existed for Noteholders. (*Id.* ¶ 10).

Second, as a basis for its fraud and contract claim, Arco takes issue with the E & Y Certifications. (*Id.* ¶¶ 89–96). The Complaint alleges that all of the E & Y Certifications obtained by Arco have patent deficiencies and fail to satisfy the condition precedent that E & Y, as an independent accountant, certify that the defaulted Reference Obligation complied with the Eligibility Criteria and Replenishment Conditions. (*Id.* ¶¶ 94–95).

Third, as a basis for its fraud and contract claim, Arco contends that Deutsche Bank falsely reported Moody's Equivalent Ratings based on its use of an outdated Moody's mapping table. (*Id.* ¶¶ 97–105, 171, 178(b)). The Complaint refers to a Moody's issued April 6, 2009 press release, which stated that "[b]ecause this mapping was performed prior to 1st April 2007, an additional stress was applied to capture potential deviations from the established mapping." (*Id.* ¶ 98). Arco alleges that the employees managing the Transaction knew, or were reckless in not knowing, that Moody's had updated the mapping table in or around April 2007, and intentionally or recklessly continued to use the old Moody's mapping table in order to be

able to falsely report higher Moody's Equivalent Ratings for the Reference Obligations in the Reference Portfolio. (*Id.* ¶¶ 103–104).

Fourth, as a basis for its fraud and contract claims, Arco contends Deutsche Bank took Credit Event Payments it should not have. (*Id.* ¶¶ 172, 178(e)). Deutsche Bank allegedly instructed HSBC to make Credit Event Payments to which Deutsche Bank knew it was not entitled, amounting to over $86 million in Credit Event Payments. (*Id.* ¶¶ 106–162). As a result of Deutsche Bank's alleged misconduct, Arco contends that it incurred damages in excess of $37 million.

## IV. *The Applicable Standards*

### *Rule 12(b)(6) Standard*

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich*, 722 F.Supp.2d 416, 423 (S.D.N.Y.2010). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

### *Section 10(b), Rule 10b–5 and the Rule 9(b) Pleading Standard*

Section 10(b) imposes civil liability on any person who uses "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale" of any security. 15 U.S.C. § 78j(b). Rule 10b–5 makes it unlawful for "any person ... to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plead that defendants " '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.' " *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir.2005) (quoting *In re IBM Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998)). Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b).

■ Rule 9(b) requires that the plaintiff "state with particularity the circumstances constituting the fraud." Fed. R.Civ.P. 9(b). To satisfy this requirement, the complaint must: "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (internal quotation marks and citation omitted). While "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. *Kalnit v. Eichler*, 264 F.3d 131, 137–38 (2d Cir. 2001).

## V. *Discussion*

### A) *The Section 10(b) Claim Survives Under Morrison*

■ Deutsche Bank seeks dismissal of the Section 10(b) claim under the transactional test adopted by the Supreme Court in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). It contends that because Arco purchased the Notes offshore, and not on a domestic exchange or in a domestic transaction, Arco cannot avail itself of the federal securities laws to bring a claim for alleged securities violations in connection with its transactions. Arco maintains that the Complaint and the documents associated with the Transaction give rise to the plausible inference that irrevocable liability arose in New York and that therefore its investment in the Notes was a domestic transaction for *Morrison* purposes.

*Morrison* involved a "foreign-cubed" class action: one in which one in which "(1) *foreign* plaintiffs [were] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries." *Id.* at 2894 n. 11 (Breyer, J., concurring in part and concurring in the judgment) (emphasis in the original). Three Australian plaintiffs sued an Australian bank, the National Australian Bank, under Section 10(b) of the Exchange Act for losses they allegedly suffered on stock purchases traded on Australian exchanges. *Id.* at 2875. The Supreme Court held that a *private* right of action under Section 10(b) and Rule 10b–5 of the Exchange Act could be maintained by foreign plaintiffs only if: (1) the security was listed on an American stock exchange or (2) the purchase or sale took place in the U.S. *Id.* at 2888. ("Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.").

In reaching its decision, the Court directed its attention to the Exchange Act's regulatory center and adopted a "transactional" test, which focused "not upon the place where the deception originated, but upon the purchases and sales of securities in the United States." *Id.* at 2884. This new transactional test replaced the Second Circuit's conduct and effects test, which asked "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens" or "whether the wrongful conduct occurred in the United States." *Id.* at 2879 (quoting *SEC v. Berger*, 322 F.3d 187, 192–93 (2d Cir. 2003)). The Court explained that the conduct and effects test lacked textual support in the Exchange Act and contravened the longstanding presumption against extraterritorial application of U.S. legislation in the absence of contrary Congressional intent. *Morrison*, 130 S.Ct. at 2878. Applying the transactional test to the case before it, the Court concluded that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," *Id.* at 2883, and dismissed the action because it "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petition-

ers who still have live claims occurred outside of the United States." *Id.* at 2888.

■ In addition, under *Morrison*, deceptive conduct is punished only "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered" but transacted in the United States. *Id.* at 2884. The Second Circuit recently addressed this second prong of *Morrison'*s transactional test and clarified what constitutes a domestic transaction. In *Absolute Activist Value Master Fund Ltd. v. Ficeto*, the Second Circuit endorsed both an "irrevocable liability" and "transfer of title" standard, holding that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange ... a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." 677 F.3d 60, 68 (2d Cir. 2012).

■ Thus, under *Morrison*, a plaintiff must demonstrate that its purchase or sale of a security was domestic by alleging that (1) the transaction involved securities traded on a domestic exchange, (2) irrevocable liability was incurred in the United States, or (3) title was passed in the United States. *See Morrison*, 130 S.Ct. at 2884; *see also Absolute Activist*, 677 F.3d at 66–67, At the pleading stage, it is sufficient for the plaintiff "to allege facts leading to the plausible inference" of a domestic transaction. *Id.* at 68. As the instant transaction does not fall in the first category, Arco must adequately allege fact demonstrating that the Notes that it purchased fall in the latter two categories.

To support its claim, Arco contends that (i) the "Issuer granted its interest in the Transaction ... to the New York Trust;" (ii) the Trustee "HSBC maintained the bank accounts for the Transactions, and all funds in the Transaction went to and from HSBC in New York;" (iii) "Deutsche Bank

controlled the Transaction from its offices in New York;" (iv) the "[relevant agreements] are all governed by New York law;" and (v) "it is plausible that decisions concerning the Transaction, including the decision to sell Notes to Arco, were made by Deutsche Bank in New York." (Opp. Br. at 6–8).

■ To the extent that Arco seeks to establish some nexus to the United States because the Deutsche Bank employees involved in the transactions were located in New York or that the contracts were governed by New York law, (Compl. ¶ 166), such assertions are irrelevant as to whether Arco's purchase of its Notes was a domestic transaction as contemplated by Morrison's transactional approach. *See Morrison*, 130 S.Ct. at 2884 (noting that "the presumption against extraterritorial application would be a craven watchdog if it retreated to its kennel whenever *some* domestic activity is involved in the case.") (emphasis in the original). While potentially relevant under conduct and effects test, courts have found such pleadings that "some acts that ultimately result in the execution of the transaction abroad [took] place in the United States amounts to nothing more than the reinstatement of the conducts test." *Pope Invs. II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608, 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012); *Cornwell v. Credit Suisse Grp.*, 729 F.Supp.2d 620, 624 (S.D.N.Y.2010) (finding that "read as a whole, the *Morrison* opinions indicate that the Court considered that under its new test § 10(b) would not extend to foreign securities trades executed on foreign exchanges even if purchased or sold by American investors, and even if some aspects of the transaction occurred in the United States...."). Examples of factual allegations that would be sufficient under *Morrison* include "facts concerning the formation of the contracts, the place-

ments of purchase orders, the passing of title, or the exchange of money, [but] the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." *Absolute Activist,* 677 F.3d at 70.

■ In addition, "the point of irrevocable liability can be used to determine the locus of a securities purchase or sale." *Id.* at 68. In this Circuit, parties incur irrevocable liability within the United States when the purchaser agrees "to take and pay for a security" in the United States or when the seller agrees "to deliver a security" in the United States. *Id.* Specifically, the Second Circuit highlighted "the time when the parties to the transaction are committed to one another ... in the classic contractual sense, [where] there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Id.* at 67–68 (citing *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972)).

Deutsche Bank contends that, under the terms of the Note Subscription Agreements between Gramercy and the Issuer, irrevocable liability attached to the transaction when the Issuer accepted each of the executed the agreements in the Cayman Islands. According to Deutsche Bank, the transaction cannot be domestic because the purchase involved a Cayman Islands' purchaser and a Cayman Islands' issuer, which was completed only upon acceptance by the Issuer in the Cayman Islands.

Arco, on the other hand, maintains that, under the Note Subscription Agreements, the sale of the Notes was expressly non-binding until the purchase price was received by HSBC in New York. Specifically, Arco asserts that the Notes Subscription

Agreements, (1) required Arco to deliver the purchase price to HSBC in New York on the Closing Date, (Note Subscription Agreements § 2) (delivery of payment to be by "immediately available funds on the Closing Date to the account to be advised to the Purchaser by the Trustee [HSBC]"); (2) the Notes were not "valid and binding" until "paid for by the Purchaser pursuant to Section 2 hereof," (Note Subscription Agreements § 3(i)); (3) receipt of payment "in accordance with Section 2" (*i.e.* delivery to HSBC) was a condition precedent to the Issuer's obligation to "sell" the Notes, (*Id.* § 7(c)); (4) the Issuer could revoke the Note Subscription Agreements in "its sole discretion at any time prior to the Closing Date," *i.e.* prior to Arco's delivery of payment; (*Id.* § 9(a)); and (5) Arco's delivery of funds to HSBC completed the Note Subscription Agreement, which automatically terminated with "the payment of the [purchase price] in accordance with Section 2 hereof." (*Id.* § 9(b)).

Courts have repeatedly held that allegations "that investors subscribed to the Funds by wiring money to a bank located in New York ... or that the Funds were heavily marketed in the United States and that United States investors were harmed by the defendant's actions," without more, do not satisfy the transactional test announced in *Morrison.* *Absolute Activist,* 677 F.3d at 70; *see MVP Asset Mgmt. (USA) LLC v. Vestbirk,* No. 2:10–cv–02483–GEB–CKD, 2012 WL 2873371, at *7 (E.D.Cal. July 12, 2012) ("Plaintiff's allegations concerning the transactions, that certain funds were transferred in between New York-based banking institutions, are insufficient to establish the existence of a domestic transaction, as required under Section 10(b)."). In *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.,* for example, the Court found that a transaction was not "completed" in New York where the investor's delivery of money was

"one step" in the process of "applying to invest in the funds." No. 08–cv–01381–MSK–CBS, 2011 WL 1211511, at *7 (D.Colo. Mar. 31, 2011). The agreement in that case also made "clear that simply sending money to New York was not sufficient to complete the transaction" and that the fund manager reserved the right to reject an application, "even if the purchase money had properly been wired to New York." *Id.*

Here, in contrast, the Note Subscription Agreements provide that the delivery of funds to HSBC automatically terminated or "consummate[d]" the transaction because that act made the contract irrevocably binding. (Note Subscription Agreements § 7) (receipt of funds a "condition" of "obligation" to "sell" Notes); *see also* 1 WILLISTON ON CONTRACTS, 1936 Ed., § 116 ("The subscription agreement is not a contract, but an offer to contract, which, when acted upon by incurring liability, becomes a binding obligation."). As outlined in Section 9, the date beyond which the Issuer no longer had the discretion to revoke acceptance was the Closing Date, when the purchaser was to transmit the funds to HSBC in New York. Thus, the irrevocable sale of the Notes occurred with the parties' performance on the Closing Date, when Gramercy delivered the funds to HSBC in New York and the Issuer assigned the interest to the Trust in New York.

Accordingly, for the reasons stated above, Arco has alleged facts leading to the plausible inference that irrevocable liability was incurred when the funds were delivered to HSBC in New York, and thus, its Section 10(b) claim survives under *Morrison.*

## B) *Arco's Section 10(b) Claim, However, is Time–Barred*

 A district court may consider timeliness on a motion to dismiss when the circumstances are "sufficiently clear on the face of the complaint and related documents as to make the time-bar ruling appropriate on a motion to dismiss." *LC Capital Partners, LP v. Frontier Ins. Group, Inc.,* 318 F.3d 148, 157 (2d Cir. 2003). Even if irrevocable liability arose in New York and Arco's Section 10(b) claim survives under *Morrison,* the claim is time-bared under the applicable statute of repose.

An action under Section 10(b) of the Exchange Act or Rule 10b–5 is subject to a five-year statute of repose or may be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b).[1] Thus, in order to determine whether Arco's § 10(b) claim is timely, it must be determined (1) when the violation occurred, and (2) when Arco can be said to have discovered the facts constituting the violation.

 The five-year statute of repose period is a fixed statutory cutoff, which is independent of a plaintiff's awareness of the violation and is not subject to equitable tolling. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (stating that "the purpose of the [statute of repose] . . . is clearly to serve as a cutoff . . . [and equitable] tolling principles do not apply to that period."); *P. Stolz Family P'ship, L.P. v. Daum,* 355 F.3d 92, 102–03 (2d Cir.2004) ("[A] statute of repose begins to run without interruption once the

---

1. The temporal limitations governing Arco's § 10(b) claims are set forth in 28 U.S.C. § 1658(b), which states:
 [A] private right of action that involved a claim of fraud, deceit, manipulation, or contrivance in contravention of regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

necessary triggering event has occurred, even if equitable considerations would warrant tolling . . . .").

■ The statute of repose begins to run "on the dates the parties have committed themselves to complete the purchase or sale of transaction." *Arnold v. KPMG LLP,* 334 Fed.Appx. 349, 351 (2d Cir.2009) (stating that "Plaintiff's contention that the period of repose begins to run at the time of the last alleged misrepresentation (even when made after the final purchase or sale of the securities) ignores the applicable limitations period, and thus is devoid of merit."); *Anwar v. Fairfield Greenwich Ltd.,* 728 F.Supp.2d 372, 428 (S.D.N.Y. 2010) (dismissing Section 10(b) claims as time-barred because the investments were made more than five years before the complaint was filed.).

In the Complaint, Arco alleges that Gramercy purchased the Notes, on its behalf, in June 2006 and January 2007. (Compl. ¶¶ 81–83). At the very latest, Arco acquired its securities in May 2007 when Gramercy allegedly transferred the Notes to Arco. (*Id.* ¶ 84). The Complaint was filed on September 27, 2012, more than five years after the latest purchase day.

Arco, however, contends that Deutsche Bank's allegedly deceptive conduct in furtherance of its scheme continued from January 2007 through 2012, which directly reduced the outstanding principal value of Arco's Notes throughout that period. (Opp. Br. at 12). According to Arco, the plain language of the statute . . . measures the repose period from the 'violation,' which is not the same things as the date of 'purchase or sale.'" (*Id.*). Arco therefore maintains that, because it commenced this action within a few months of the end of the Transaction in June 2012, its claim is timely. (*Id.*).

Arco cites to certain cases that it claims supports its position that the statute of repose runs from the date of the last mis-representation. (*Id.*). Several of these cases pre-date *Arnold,* are factually inopposite, or are from outside of this Circuit. For example, Arco relies on *In re Beacon Assocs. Litig.,* 282 F.R.D. 315 (S.D.N.Y. 2012) and *Plymouth County Ret. Ass'n v. Schroeder,* 576 F.Supp.2d 360 (E.D.N.Y. 2008) for the proposition that "where a series of fraudulent misrepresentations is alleged, this 'period of repose beings when the last alleged misrepresentation was made.'" Both cases cite to *In re Dynex Capital, Inc. Secs. Litig.,* which pre-dates *Arnold* and which limited the date of the last misrepresentation to circumstances where "plaintiff purchased the bonds at issue less than five years before filing suit." No. 05 Civ. 1897(HB), 2006 WL 314524, at *5 n. 4 (S.D.N.Y. Feb. 10, 2006).

Indeed, district courts that have employed Arco's formulation have done so in the context of claims by plaintiffs who, unlike Arco, purchased their securities within five years prior to the commencement of their action. *See e.g., In re Tower Automotive Sec. Litig.,* 483 F.Supp.2d 327, 331 (S.D.N.Y.2007). Alternatively, this and other courts in this Circuit have held that the repose period runs from the date of last misrepresentation when the last alleged misrepresentation predates the purchase. *See e.g., Intesa Sanpaolo, S.p.A v. Credit Agricole,* 924 F.Supp.2d 528, 536–37 (S.D.N.Y.2013) (distinguishing *Arnold*'s holding from a situation where the last alleged misrepresentation pre-dated purchase); *Isanaka v. Spectrum Tech. USA Inc.,* 131 F.Supp.2d 353, 358 (N.D.N.Y. 2001) (stating that "a violation of section 10(b) and Rule 10b–5 can take place before and up to the time when the sale of securities take place, but not after the investment is made.") (citation omitted). Thus, where post-purchase violations are alleged, having a repose period triggered on the date of purchase is consistent with the well-established rule that a statute of re-

pose cannot be equitably tolled. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773.

In a supplemental letter to the Court, Arco suggests that decisions such as *Arnold,* which refer to a transaction date, "do so conclusorily, and without addressing the statutory term 'violation'" in 28 U.S.C. § 1658(b). While the Second Circuit in *Arnold* did not engage in statutory construction, it instead relied on a prior decision, which held that "the statute of repose in federal securities law claims 'starts to run on the date the parties have committed themselves to complete the purchase or sale transaction.'" *Arnold,* 334 Fed. Appx. at 351 (quoting *Grondahl v. Merritt & Harris, Inc.,* 964 F.2d 1290, 1294 (2d Cir.1992)). In addition, the *Arnold* Court was expressly invited to consider several of the cases now cited by Arco, but declined to do so. (*See* Tambe Supp. Decl. Exs. A and B) (highlighting the relevant excerpts of appellant's briefs in *Arnold* making the same argument advanced here by Arco).

Taken together, the allegedly fraudulent conduct here occurred after the date of purchase and Arco has not meaningfully distinguished itself from *Arnold* to align itself with the line of cases that have allowed for the statute of repose to run from the date of the last misrepresentations. Without any dispositive distinguishing facts from *Arnold,* there is no reason to disturb the long-line of cases in this district upholding *Arnold's* holding.

■■■■ In addition, pursuant to § 1658(b), Arco was required to have asserted its § 10(b) claims within two years of the date upon which "a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 175 (2d Cir.2011). Thus, with respect to the facts showing scienter, which are "among those facts that 'consti-

tut[e] the violation'" under 1658(b), *Merck & Co., Inc. v. Reynolds,* 559 U.S. 633, 130 S.Ct. 1784, 1796, 176 L.Ed.2d 582 (2010), they are deemed "discovered" for § 1658(b) purposes when the plaintiff has uncovered (or when a reasonably diligent plaintiff *would have* uncovered) enough information about the defendant's knowledge or intent "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind such that it is at least as likely as not that the defendant acted with the relevant knowledge or intent." *Pontiac,* 637 F.3d at 175.

■■■ A plaintiff may establish the requisite strong inference of fraud if the Complaint "(1) demonstrates 'that defendants had both motive and opportunity to commit fraud,' or (2) alleges 'facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Campo v. Sears Holdings Corp.,* 635 F.Supp.2d 323, 332–33 (S.D.N.Y.2009) (citation omitted).

Citing to paragraphs 76, 79, 88 through 96 of the Complaint, Arco contends that its allegations are more than sufficient to allege scienter. These paragraphs refer to the Upsize in January 2007, the E & Y Certifications issued after the five Credit Events, and a conclusory statement of Deutsche Bank's misconduct. (*See* Compl. ¶ 88) (alleging that "[a]fter the Upsize, Deutsche Bank systematically violated the terms of the Transaction and engaged in other misconduct so pervasive that it demonstrates an intention to use the Transaction to commit fraud on the Noteholders, including Arco."). Because the allegations in the Complaint relevant to scienter, as pled, demonstrate that Arco could have discovered "the facts constituting the violation" within two years of the date upon which "a reasonably diligent plaintiff would have sufficient information about

that fact to adequately plead it in a complaint[,]" Arco's Section 10(b) claims have expired. *Pontiac,* 637 F.3d at 175. Accordingly, Arco's Section 10(b) claim are untimely with respect to § 1658(b)'s five-year statute of repose and two-year post-discovery deadline.

### C) *The Supplemental Jurisdiction Over Arco's Breach of Contract Claim is Declined*

■ Because Arco's Section 10(b) claim is dismissed as time-barred pursuant to 28 U.S.C. § 1658(b), there is no need to reach on the sufficiency of the allegations in the Complaint as to that claim. The Complaint also alleges as breach of contract claim under New York law. Arco contends that it is a third-party beneficiary under the CDS Agreement, which Deutsche Bank allegedly breached.

"[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Klein & Co. Futures, Inc. v. Bd. of Trade,* 464 F.3d 255, 262 (2d Cir.2006) ("[W]here, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.") Because Arco's federal claim is dismissed, the Court declines to exercise supplemental jurisdiction over its breach of contract claim.

### VI. *Conclusion*

Based on the conclusions set forth above, Defendant's motion to dismiss Plaintiff's federal securities law claim is granted with leave to replead within 20 days. Supplemental jurisdiction over Plaintiff's state law cause of action is declined, without prejudice.

It is so ordered.